[Civil No. 4373.   Filed June 16, 1941.]

[114 Pac. (2d) 227.]

A. R. BUEHMAN, MARVIN IRWIN, MARY KELLY, TOM BATE and FLOYD GETSIN-GER, Constituting the Board of Examiners in Photography, Appellants, v. ORVILLE W. BECHTEL, Appellee.

Mr. Joe Conway, Attorney General, Mr. Earl Anderson and Mr. W. E. Polley, Assistant Attorneys General, and Mr. Marshall W. Haislip, of Counsel, for Appellants.

(No Appearance for Appellee.)

Mr. H. B. Hamilton, of Santa Rosa, New Mexico, and Mr. Allan K. Perry, *Amici Curiae.*

ROSS, J.—This action was brought by Orville W. Bechtel against the Board of Examiners in Photography, consisting of A. R. Buehman, Marvin Irwin, Mary Kelly, Tom Bate and Floyd Getsinger, to secure a declaratory judgment as to the constitutional validity of Chapter 31, Laws of 1935, secs. 67–1601 to 67–1615, Arizona Code, 1939. It is claimed that such act is in conflict with and repugnant to the due process and equal protection clauses of the 14th Amendment to the Constitution of the United States and to section 4, Article II of the state Constitution, prohibiting the deprivation of life, liberty or property without due process. Also that it violates subsection 13 of section 19, part 2, Article IV of the state Constitution, prohibiting the granting of special or exclusive privileges by local or special laws.

The trial court held the law was unconstitutional for all the reasons named, and the board has appealed.

A synopsis of the act is as follows:

It defines the practice of photography as "the business or profession, occupation or avocation of taking or producing photographs, or any part thereof, for hire." Sec. 67–1601 (b).

It provides for the appointment of five members to a board of examiners, each of whom shall have been in the practice of photography at least five years in Arizona before his appointment. Sec. 67–1602.

It provides that the board shall organize by electing a president and a secretary-treasurer; that it shall meet publicly at least once a year; that its members shall be paid $5 for each day's attendance and actual traveling expenses, and that the secretary-treasurer shall be allowed an expense account of $100 a year for stenographic assistance; that all fees or other revenue shall be paid into the state treasury and 10% thereof credited to the state's general fund to assist in defraying the cost of the maintenance of the state government, and the remainder credited to "The Photographers' License Fund," to be used only for defraying expenses of the board in the prosecution of violations of the act. Sec. 67–1603.

The board is authorized to examine applicants who desire to practice photography and issue certificates and licenses "to such as qualify as to competency, ability and integrity." It may take testimony "as to technical qualifications or the business record of the applicant, and . . . may, at its discretion, for sufficient reason, grant or withhold a license to practice." Sec. 67–1604.

The examination fee is $25 and if the applicant fails he may have a second examination upon paying $10. For a third examination he is required to pay the regular fee of $25. Persons residents of the state and licensed to practice may do so under an assumed or fictitious name by placarding in their place of business their full names and such assumed or fictitious name. Sec. 67–1607.

Each practitioner maintaining an established place of business, and who is not merely an employee, is re-

quired to pay an annual fee of $5 for an establishment license; a person licensed to practice photography, who is an employee of an establishment in portrait or commercial photography, $3, and in kodak or amateur finishing, $2. Sec. 67–1609.

Provision is made for those lawfully engaged in the practice at the time the act went into effect to continue without an examination upon paying the regular fee. Sec. 67–1611.

It declares that it shall be unlawful for any un-licensed person or firm to practice photography. Sec. 67–1612.

It provides that anyone who practices or attempts to practice photography in the state without first complying with the act, or who violates any of its provisions, shall be punished by a fine for each offense of not less than $50 nor more than $200, or by imprisonment for not less than 30 days nor more than six months, or both; that "each sale shall be a separate offense." Sec. 67–1613.

Section 67–1614 reads:

"*Exemptions.*—Nothing in this act shall be construed to apply:

"(1) To a person in the employ of any newspaper or periodical publication, provided the negatives or photographs made by such person are not sold or offered for sale, or otherwise disposed of in this state for profit;

"(2) To a person who shall make negatives or photographs for experimental purposes or for his or her own personal use or pleasure, provided such negatives or photographs are not sold or offered for sale in this state;

"(3) Nor to a person who is in the employ of any school, college, or institution maintained by the state of Arizona, who shall make negatives or any reproduction therefrom solely for the use of said school, college or institution, for educational or scientific purposes;

"(4) To a licensed medical or dental practitioner who shall make negatives or photographs for clinical purposes:

"(5) To motion picture operators in making motion pictures;

"(6) To x-ray, blue-print, photostatic or motion picture operators."

The act in question does not pretend to regulate the practice of photography in the interests of the business or the public but, rather, in the interests of those professional photographers who are fortunate enough to obtain a license. In other words, under the pretext of regulating the innocuous business or trade of photography, the legislature has passed a law to prohibit certain unlicensed persons from making photographs for hire and from selling them in Arizona when taken for one's own pleasure, use or diversion. Under the act, anyone may take photographs unless he does it for hire, but he may not sell the pictures that he has lawfully taken. He may develop them, show them, and give them away. In other words, they are his property for all purposes except sale.

The legislature may prohibit or regulate the sale of some things, such as intoxicating liquors, habit-forming drugs, lewd and lascivious pictures and things of that kind, but we know of no principle of law that could prevent the owner of a photograph of a baby, flower or landscape from selling it, even though he had taken and finished it without being licensed to do so. The business or profession of taking photographs of people, animals and things does not need regulation. It is one of the innocent, usual occupations in which everybody who so wishes may indulge as a pasttime or a hobby or a vocation, without harm or injury to anybody, or to the general welfare, or the public health and morals, or the peace, safety and comfort of the people. It needs no policing.

Of the cases that have passed upon the precise question, three out of four have held laws attempting to regulate the practice of photography violate the due process and equal protection clauses of the federal and state constitutions. Excerpts from these decisions show the general tenor of the courts' reasoning:

" 'Notwithstanding that the policy of legislation is outside the scope of judicial review, in order to protect the individual right of a citizen to engage in a private business or vocation without unreasonable restraint, which right is recognized by the 14th Amendment to the Constitution of the United States and by Article 1, section 8 and Article 11, section 8 of the Constitution of Tennessee, the courts are required to determine whether a statute enacted in the exercise of the police power has any real tendency to protect the public safety, the public health or the public morals, and whether the interests of the public generally, as distinguished from those of a particular class, require such interference.'

"We find it difficult to perceive just how the licensing of photographers and regulation of the taking and finishing of pictures, with the exceptions therein set forth, provided for by this Act, 'has any real tendency to protect the public safety, the public health or the public morals'; or how and why 'the interests of the public generally, as distinguished from those of a particular class, require such interference' as this Act provides." *Wright* v. *Wiles*, 173 Tenn. 334, 117 S. W. (2d) 736, 738, 119 A. L. R. 456.

"Was the General Assembly authorized, under the police power, to impose these various regulatory conditions upon those engaged in the business of photography or photofinishing; or, more concretely, was there any basis affecting the public interest for the requirement of examination 'as to competency, ability, and integrity?' In *Schlesinger* v. *Atlanta*, 161 Ga. 148, 158, 129 S. E. 861, 866, it was said: 'The right to use one's own property as he sees fit, so long as he does not thereby injure others, and to engage in lawful occupations in proper places and at proper times, is a right which not even the legislative power of the state can

take from the individual. The right to make a living is among the greatest of human rights, and, when lawfully pursued, cannot be denied.' . . . '' *Bramley* v. *State,* 187 Ga. 826, 2 S. E. (2d) 647, 651.

''No business, however innocent and harmless, is entirely free from the possibility of becoming, under improper or dishonest management, in some degree inimical to the public interest. The business of shining shoes unless efficiently conducted might result in injury to the material of which shoes are made. A dry goods business might if operated by a dishonest or ignorant owner result in foisting on the public unskillfully made or otherwise shoddy clothing. The business of horseshoeing might likewise be injurious. So with the business of accounting. And yet no court has ever held that it is within the police power of the State to impose upon those desiring to follow such occupations the necessity of passing an examination as to their qualifications and obtaining a certificate of proficiency and honesty. So far.as horseshoeing and accountancy are concerned, as we have seen, such a requirement has been held unconstitutional.

''So long as the police power is confined to its legitimate purpose and is not through some fallacy of logic given a specious recognition it is of inestimable value; otherwise there is danger of its becoming an evil. There is as great peril to the public in its injudicious extension as in its injudicious restriction. In other words, as a servant of the people it is invaluable but as their master it might become intolerable.'' *Territory* v. *Kraft,* 33 Haw. 397.

The only discordant note on the question is found in *State* v. *Lawrence,* 213 N. C. 674, 197 S. E. 586, 116 A. L. R. 1366, *certiorari* denied, 305 U. S. 638, 59 Sup. Ct. 105, 83 L. Ed. 411, wherein it was decided by a three-to-two decision that a photography act, much like ours, was not unconstitutional. In the course of time, dissenting opinions frequently become the law, and we think that is true with reference to the Lawrence case. In *State* v. *Harris,* 216 N. C. 746, 6 S. E. (2d) 854, 861, 128 A. L. R. 658, an act of the legislature

providing for the regulation and licensing of persons engaged in the cleaning, dyeing and pressing business was involved. It provided for a commission of five and authorized it to issue licenses to persons desiring to conduct such business, under such rules and regulations as the commission might formulate. In an opinion written by one of the dissenting judges in the Lawrence case, and for the reasons urged in that case as invalidating the photography act, and for many other reasons, it was decided by a unanimous court that the dry cleaning act was unconstitutional.

In the Harris case it was argued that the tendency of the courts recently was to accept the legislative mandate without question as to the necessity of regulation and that, if the legislature declared the business or occupation was of such character as to require supervision by the state, that was the end of it. The court, speaking of such contention, said:

"It is the fault of the argument, not of its candid restatement, if it falters at critical points. Under it there is not a calling or trade, however simple and harmless, that may not be preempted and monopolized by the first group that stakes out its claim and raises over the camp the 'keep off sign.' If the court should adopt a theory of that sort it cannot thereafter hope to protect the rights of any man under these constitutional provisions from the grossest aggression.

"Those who are versed in the history of this expression ('clothed with a public interest') will understand our disinclination to make the rights either of society or the individual to depend on a play upon words. *Tyson & Bro. United Theatre Ticket Offices* v. *Banton*, 273 U. S. 418, 47 Sup. Ct. 426, 71 L. Ed. 718, 58 A. L. R. 1236. There are many social and public interests which logically form no basis for police interference with private business or for withdrawing the protection of constitutional guaranties. Society is always interested in the trades and occupations which underlie it; there is a social interest arising from the mu-

tuality of patronage and service; and there are many situations in the social complex that may create a desire on the part of one group to improve the conditions of contact and pressure with another, none of which as social or public interest is comparable with the importance of the social interest involved in the maintenance of personal liberty guaranteed by the Constitution. *Tyson & Bro. United Theatre Ticket Offices* v. *Banton, supra; Ribnik* v. *McBride,* 277 U. S. 350, 48 Sup. Ct. 545, 72 L. Ed. 913, 56 A. L. R. 1327. Compare: *Louisville & N. R. Co.* v. *Kentucky,* 161 U. S. 677, 16 Sup. Ct. 714, 40 L. Ed. 849; *Munn* v. *Illinois,* 94 U. S. 113, 24 L. Ed. 77; *Chas. Wolff Packing Co.* v. *Court of Industrial Relations,* 262 U. S. 522, 43 Sup. Ct. 630, 67 L. Ed. 1103, 27 A. L. R. 1280.

''*Nebbia* v. *New York,* 291 U. S. 502, 54 Sup. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, upon which the prosecution seems to lean rather heavily, deals with the suggested test—'whether the business is clothed or affected with a public interest'—and while it recognizes the impracticability of the formula, the technique employed leaves us in doubt whether the court intended to dismiss it altogether (through the process of benevolent dispersion), and adopt a new liberalism toward governmental control of business, or to stick to the formula in a much expanded sense and give to the new adjustment between social demands and constitutional restraint the color of historic authenticity. Annotation 119 A. L. R. 985, 986.''

Appellants here rely upon *Nebbia* v. *New York,* 291 U. S. 502, 54 Sup. Ct. 505, 511, 78 L. Ed. 940, 89 A. L. R. 1469, as decisive of the question. That case sustained the right of the State of New York to fix the price of milk, upon the ground that milk was an essential diet and that such price fixing was necessary to the survival of the producer or at least to his ability to produce and supply the inhabitants of the state such needed food in the quantities, quality and at the times demanded. In the course of the discussion the court said:

'' . . . It results that a regulation valid for one sort of business, or in given circumstances, may be invalid

for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts.

"In the light of the facts the order [fixing the price of milk] appears not to be unreasonable or arbitrary, or without relation to the purpose to prevent ruthless competition from destroying the wholesale price structure on which the farmer depends for his livelihood, .and the community for an assured supply of milk."

This case does not announce the rule that a state legislature may pass any kind of regulatory law for any kind of business or occupation under the police power but, on the contrary, conditions the exercise of such power with the limitation that it must not be arbitrary or discriminatory.

The business or profession of making photographs is not inherently dangerous to society but is an entirely innocent occupation. If there be those engaged in it who make false representations as to the finish, quality or price of their product, it is not different in that respect from other lines of business. All businesses have their cheats, whose crimes are cared for by the general laws. Photography is not supposed to be an unhealthy or insanitary business needing medical supervision. It will not prosper the community or other lines of business or trade to limit the number of those who may engage in the business. It cannot harm those who pursue it nor anyone else, but may benefit its votaries in both health and finances. The police power, broad and comprehensive as it is, may not be used to prevent a person from following a business or occupation so innocuous, and the effort to do so is so unreasonable and arbitrary as to amount to a deprivation of a property right—the right to earn a living—without due process.

As heretofore indicated, the act might well have been entitled:

"An act to prohibit all persons (with the exceptions enumerated) who have taken photographs in Arizona, except those who have been licensed as herein provided to practice photography, from selling their photographs in Arizona;"

for the privilege of taking photographs except for hire is not prohibited to unlicensed photographers but the sale thereof is. The right to make sales is therein confined to those enumerated in section 67–1614, the five professional photographers composing the board of examiners and the select few this board may choose to license. It is true the act (in section 67–1604) seems to leave the door open to those who, in their examination by the board, "qualify as to competency, ability and integrity," yet in the very next breath it says the board "may, at its discretion, for sufficient reason, grant or withhold a license to practice."

Only the legislature can create the standard and provide the reasonable limits of the power of admitting and excluding persons from a business, trade or profession. *State* v. *Harris, supra.* It may be granted that the legislature has fixed the standard as competency, ability and integrity and that such standard is a sufficient and a proper one for a person desiring to practice photography, yet it is apparent the legislature used language the board might construe as giving it the right to disregard such standard and set up an arbitrary standard of its own. The board might regard too much or too strong competition as "sufficient reason" for not licensing a person, or the applicant's age, sex, color or religion might disqualify him. We cannot say the standard fixed by the legislature is not a sufficient guide to the board of examiners, or that the board would arbitrarily disregard such standard and refuse a license to one who qualified under the act, but we do call attention to the fact that

the board may use its powers to make it very difficult for worthy persons to secure a license to practice photography.

In connection with the free use of the police power over certain trades and occupations, for the purpose of securing to those engaged therein rights and powers of an exclusive and monopolistic character, we again quote from *Harris* v. *State:*

"Statutes regulating trade and occupations by the delegation of governmental power to boards and commissions formed largely of the groups affected, intended primarily to control the personnel of the business, have become so common as to affect progressively and importantly the social and economic life of the State. A large number of laws of that character may be listed which not only regulate but organize into autonomous corporations occupations ranging from the learned professions to the ordinary trades. U. N. C. Law Review, Vol. 17, p. 1.

"No independent administrative supervision is provided over these organizations. No report of their activities is made to any responsible branch of the government. No audit is made by the State, except where items may incidentally affect the State Treasury. These matters are left to internal control. The organizations are, so to speak, legislatively launched and put on their own.

"The stage of internal protest has been reached. In marginal cases controversies in the courts have arisen as to whether the organization has captured a sufficient *quantum* of public purpose to operate as an agency of the government, or whether the police power of the State, ostensibly exercised for a public purpose, is not really farmed out to a private group to be used in narrowing the field of competition, or in aid of exploitation by creating remunerative positions in administration. *Roach* v. *Durham,* 204 N. C. 587, 169 S. E. 149; *State* v. *Lawrence,* 213 N. C. 674, 197 S. E. 586, 116 A. L. R. 1366. Without the aid of the statute these groups would be mere trade guilds, or voluntary business associations; with it they become State agen-

cies, retaining, however, as far as possible, distinctive guild features. An exclusive self-governing status is achieved by the device of securing a majority membership on the administrative boards or commissions, and in aid of this the power of the State is heavily invoked by way of prosecution in the criminal courts of those who are unable to secure the approval of the Board and obtain license to engage in the occupation.

"It is this power of exclusion of fellow workers in the same field that gives to the subject its social significance, and invites our most serious consideration of the constitutional guaranties of personal liberty and individual right called to our attention."

▮ Some of the things accomplished by the act are: (1) a complete internal control of the practice of photography by the interested members of that business or profession through admissions thereto with little else relating to regulation; (2) it selects one owner of property and authorizes him to sell in Arizona and prohibits others from selling in Arizona the same kind and quality of property, honestly and lawfully acquired.

"One of the principal elements of property is the right of alienation or disposition. This right is one of the essential incidents of a right of general property in movables, and restraints on alienation have been generally regarded as obnoxious to public policy, which is best subserved by great freedom of traffic in such things as pass from hand to hand. . . . " 22 R. C. L. 83, sec. 64.

This discrimination between the owners of property is not in the interests of the general welfare or public health or morals, but solely in the interests of those in the legislatively authorized guild of photographers. Such favoritism is not based upon any difference in the use or kind of property but is purely arbitrary.

As conclusive evidence that the act is intended as a limitation on the sale of photographs and not on their

production, attention is called to the exemptions in section 67–1614.

The act is bad for another reason:

" . . . Instead of furnishing needed protection to the public it would, as in the instant case, confer upon a board of examiners, composed entirely of professional photographers, the power to grant to a selected number the right of pursuing a useful and innocent business. This would be to create a monopoly and thus exclude from the business many competent persons who might find in it a congenial occupation and a means of livelihood." *Territory* v. *Kraft, supra.*

■ This court has certainly and definitely condemned legislation tending to promote monopoly in private business. In *State* v. *Childs,* 32 Ariz. 222, 257 Pac. 366, 367, 54 A. L. R. 736, we had before us an act of the legislature that prohibited any person except registered pharmacists from selling patent or proprietary medicines or those in the original packages of the manufacturer, and we said such legislation

"does not in the slightest degree protect the public, but grants a monopoly of a business recognized by the state as legitimate to one class of persons, without any legitimate reason therefor. We think the general rule contended for by defendants, to the effect that a statute allowing one class of persons to engage in what is presumptively a legitimate business, while denying such right to others, must be based upon some principle which may reasonably promote the public health, safety or welfare, that unless it does so in some degree it is unconstitutional, and that while every presumption is in favor of the validity of a statute, yet when it clearly appears that on no reasonable theory could such a one contribute to the public health or safety it is the duty of the courts to so declare and to set it aside as unconstitutional, is well taken. . . . "

■ We think the judgment declaring the law unconstitutional on the ground of repugnancy to the 14th Amendment to the Constitution of the United States

and section 4 of Article II of our Constitution, should be sustained, and it is accordingly so ordered.

McALISTER, J., concurs.

LOCKWOOD, C. J.—I dissent. The Supreme Court of the United States in the case of *Nebbia* v. *New York*, 291 U. S. 502, 54 Sup. Ct. 505, 516, 78 L. Ed. 940, 89 A. L.R. 1469, has specifically and definitely laid down the rule that so far as the 14th Amendment to the Federal Constitution is concerned, the states have the right to regulate each and every class of business or occupation which is engaged in by their citizens, and that the question of whether the business should be regulated is a matter for legislative and not judicial determination. The only power which the courts have is, not to determine whether the business is of a nature that it cannot nor should not be regulated, but whether the particular regulations are ''seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory,'' and that ''whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.'' *Nebbia* v. *New York, supra.*

In the case of *State* v. *Lawrence,* 213 N. C. 674, 197 S. E. 586, 116 A. L. R. 1366, the act whose constitutionality was challenged is almost exactly like that under consideration in this case. It was attacked on the ground that it violated the 14th Amendment of the Federal Constitution. The state court held that it did not, and a petition for *certiorari* was filed in the Supreme Court of the United States. *Certiorari* was denied by that court. 305 U. S. 638, 59 Sup. Ct. 105, 83 L. Ed. 411. This can only be taken as a determination that the highest tribunal in the land did not consider the act violated the 14th Amendment.

The majority of this court has seen fit in effect to overrule that decision. I cannot concur. It is very true that we have the power to hold that the provision of our own Constitution, which is taken from the Federal Constitution, does not mean in our Constitution what it means in the Federal Constitution, but I seriously question the wisdom of such a conclusion.