STACY, C. J., dissenting.
WINBORNE, J., concurs in dissent.
The defendant was charged with violating Chapter 92 of the General Statutes by engaging in the practice of photography for compensation without being licensed so to do by the State Board of Photographic Examiners.
The jury returned a special verdict in which it found, in substance, that on 25 June, 1948, in Raleigh, North Carolina, a city having a population in excess of twenty-five hundred, the defendant took and produced photographs and sold the same at unit prices exceeding ten cents per picture without being licensed to practice photography in North Carolina by the State Board of Photographic Examiners.
The court adjudged upon the special verdict that the defendant was guilty "under and according to the ruling made by the Supreme Court in the case of State v. N. L. Lawrence reported in Volume 213 at page 674 *Page 766 
of the N.C. reports," ordered that a verdict of guilty as charged be entered against the defendant, and gave judgment that the defendant pay a fine of $50.00 and the costs. The defendant excepted to the rulings of the court and appealed from the judgment against him.
Chapter 92 of the General Statutes had its origin in Chapter 155 of the Public Laws of 1935, and was enacted to control or regulate the practice of photography, which is defined to be "the profession or occupation of taking or producing photographs or any part thereof for hire." G.S. 92-1. It establishes a State Board of Photographic Examiners consisting of five members designated by the Governor, "all of whom shall be residents of the State of North Carolina and shall have had not less than five years experience as professional photographers." G.S. 92-2. The statute prohibits the practice of photography by persons who have not been licensed by the Board of Photographic Examiners. G.S. 92-20. Any person engaging in the practice of photography without being so licensed is guilty of a misdemeanor. G.S. 92-24. The Board issues a license upon application and without examination to every photographer who was continuously engaged in the practice of photography in North Carolina for one year next preceding the passage of the act. G.S. 92-18. Any other person desiring to practice photography must undergo an examination by the Board and qualify thereon "as to competency, ability, and integrity." G.S. 92-10. The statute prescribes that "Prior to any applicant being admitted to an examination or licensed, said Board shall have the power to require proof as to the technical qualifications, business record and moral character of such applicant, and if an applicant shall fail to satisfy the Board in any or all of these respects, the Board may decline to admit said applicant to examination, or to issue license." G.S. 92-11. The Board is given power upon notice and hearing to revoke any license granted by it to any photographer "found by the Board to be guilty of fraud or unethical practices or of wilful misrepresentation, or found guilty under the laws of the State of North Carolina of any crime involving moral turpitude." G.S. 92-23. The Board is authorized to adopt and enforce all rules and orders necessary to carry out the provisions of the chapter. G.S. 92-7. It is directed to collect specified examination fees from applicants and specified annual license fees from practicing photographers, and to use the same to defray the expenses of administering the law. G.S. 92-13, 92-14, 92-19, 92-27. *Page 767 
The exceptive assignments of error of the accused challenge the validity of his trial, conviction, and sentence upon the specific ground that the Legislature transgressed designated provisions of the organic law of the State when it adopted Chapter 92 of the General Statutes.
It is plain that the position of the defendant cannot be sustained without overruling S. v. Lawrence, 213 N.C. 674, 197 S.E. 586, 116 A.L.R. 1366, where a divided Court adjudged this statute to be constitutional. Consequently, the accused is met at the threshold of the case by the assertion of the State that the only question raised by the appeal has heretofore been deliberately examined and decided and ought to be deemed as settled and closed to further argument.
At first blush, this suggestion appears to have much force. In adjudicating a case, a court is not concerned with what the law ought to be, but its function is to declare what the law is. Moreover, the law must be characterized by stability if men are to resort to it for rules of conduct. These considerations have brought forth the salutary doctrine ofstare decisis which proclaims, in effect, that where a principle of law has become settled by a series of decisions, it is binding on the courts and should be followed in similar cases. S. v. Dixon, 215 N.C. 161, 1 S.E. (2) 521; Spitzer v. Comrs., 188 N.C. 30, 123 S.E. 636; Williamson v.Rabon, 177 N.C. 302, 98 S.E. 830; Hill v. R. R., 143 N.C. 539,55 S.E. 854, 9 L.R.A. (N.S.) 606.
But the case at bar does not call the rule of stare decisis in its true sense into play. Here, no series of decisions exists. Spitzer v. Comrs.,supra. We are confronted by a single case which is much weakened as an authoritative precedent by a dissenting opinion "of acknowledged power and force of reason." Collie v. Commissioners, 145 N.C. 170, 59 S.E. 44. Indeed, S. v. Lawrence, supra, appears to be irreconcilable with the subsequent well considered holding in S. v. Harris, 216 N.C. 746, 6 S.E. (2) 854, 128 A.L.R. 658. Besides, the doctrine of stare decisis will not be applied in any event to preserve and perpetuate error and grievous wrong. Spitzer v. Comrs., supra; Patterson v. McCormick, 177 N.C. 448,99 S.E. 401. As was said in Spitzer v. Comrs., supra, "There is no virtue in sinning against light or in persisting in palpable error, for nothing is settled until it is settled right."
Some observations of the Supreme Court of Pennsylvania seem specially pertinent. "Where a question involving important public or private rights extending through all coming time has been passed on on a single occasion, and the decision can in no just sense be said to have been acquiesced in, it is not only the right but the duty of the courts, when properly called on, to re-examine the questions involved and again subject them to judicial scrutiny." Commonwealth ex. rel. Margiotti v. Lawrence, 326 Pa. 526,193 A. 46. *Page 768 
It is noteworthy that S. v. Lawrence, supra, stands alone, and is contrary to the conclusion reached by the courts of last resort in the other seven jurisdictions which have had occasion to pass upon the constitutionality of practically identical statutes professing to regulate the practice of photography through the agency of examining boards. Buehmanv. Bechtel, 57 Ariz. 363, 114 P.2d 227, 134 A.L.R. 1374; Sullivan v.DeCerb, 156 Fla. 496, 23 So.2d 571; Bramley v. State, 187 Ga. 826,2 S.E.2d 647; Territory v. Kraft, 33 Haw. 397; State v. Cromwell,72 N.D. 565, 9 N.W.2d 914; Wright v. Wiles, 173 Tenn. 334, 117 S.E.2d 736, 119 A.L.R. 456; Moore v. Sutton, 185 Va. 481, 39 S.E. (2) 348. The Arizona, Florida, Georgia, North Dakota, and Virginia decisions were handed down after the Lawrence case.
During the past 172 years, the organic law of this State has contained the solemn warning that "a frequent recurrence to fundamental principles is absolutely necessary to preserve the blessings of liberty." Const., 1776, Declaration of Rights, Art. XXI; Const., 1868, Art I, section 29. When the representatives of the people of North Carolina assembled in Congress at Halifax on 12 November, 1776, for the express purpose of framing a Constitution, they possessed an acute awareness of the long and bitter struggle of the English speaking race for some substantial measure of dignity and freedom for the individual. They loved liberty and loathed tyranny, and were convinced that government itself must be compelled to respect the inherent rights of the individual if freedom is to be preserved and oppression is to be prevented. In consequence, they inserted in the basis law a declaration of rights designed chiefly to protect the individual from the State. When it rewrote the fundamental law, the Convention of 1868 retained these provisions and incorporated them and certain other guaranties of personal liberty in the First Article of the present State Constitution, which like its counterpart in the Constitution of 1776 is designated a "Declaration of Rights."
This appeal presents the question of whether the statute under attack is void for repugnancy to the constitutional guaranties now appearing in Article I, sections 1, 17, and 31 of the Constitution.
Article I, section 1, was placed in the Constitution by the Convention of 1868, and declares "that we hold it to be self-evident that all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness." In drafting this section, the Convention borrowed certain phraseology from the Declaration of Independence, changed the words "these truths" therein appearing to "it," and made the interpolation "the enjoyment of the fruits of their own labor."
Article I, section 17, was copied in substance from Magna Charta by the framers of the Constitution of 1776, and prescribes that "no person *Page 769 
ought to be taken, imprisoned, or disseized of his freehold, liberties or privileges, or outlawed or exiled, or in any manner deprived of his life, liberty or property, but by the law of the land." The term "law of the land" is synonymous with "due process of law," a phrase appearing in the Federal Constitution and the organic law of many states. Yancey v. HighwayCommission, 222 N.C. 106, 22 S.E.2d 256; Plott v. Ferguson, 202 N.C. 446,163 S.E. 688; Yarborough v. Park Commission, 196 N.C. 284,145 S.E. 563; Gunter v. Sanford, 186 N.C. 452, 120 S.E. 41; Parish v.Cedar Co., 133 N.C. 478, 45 S.E. 768, 98 Am. S. R. 718.
These fundamental guaranties are very broad in scope, and are intended to secure to each person subject to the jurisdiction of the State extensive individual rights, including that of personal liberty. The term "liberty," as used in these constitutional provisions, does not consist simply of the right to be free from arbitrary physical restraint or servitude, but is "deemed to embrace the right of man to be free in the enjoyment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary for the common welfare. . . . It includes the right of the citizen to be free to use his faculties in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or vocation, and for that purpose to enter into all contracts which may be proper, necessary, and essential to his carrying out these purposes to a successful conclusion." 11 Am. Jur., Constitutional Law, section 329. See, also, in this connection: Allgeyer v.Louisiana, 165 U.S. 578, 41 L.Ed. 832, 17 S.Ct. 427; S. v. Moore,113 N.C. 697, 18 S.E. 342, 22 L.R.A. 472.
Undoubtedly, the State possesses the police power in its capacity as a sovereign, and in the exercise thereof, the Legislature may enact laws, within constitutional limits, to protect or promote the health, morals, order, safety, and general welfare of society. Clinton v. Ross,226 N.C. 682, 40 S.E.2d 593; Brewer v. Valk, 204 N.C. 186,167 S.E. 638, 87 A.L.R. 237; Elizabeth City v. Aydlett, 201 N.C. 602,161 S.E. 78; Wake Forest v. Medlin, 199 N.C. 83, 154 S.E. 29; S. v. Lockey,198 N.C. 551, 152 S.E. 693; Sanitary District v. Prudden, 195 N.C. 722,143 S.E. 530.
An exertion of the police power inevitably results in a limitation of personal liberty, and legislation in this field "is justified only on the theory that the social interest is paramount." S. v. Mitchell, 217 N.C. 244,7 S.E.2d 567. In exercising this power, the Legislature must have in view the good of the citizens as a whole rather than the interests of a particular class. 11 Am. Jur., Constitutional Law, section 274. If a statute is to be sustained as a legitimate exercise of the police power, it must have a rational, real, or substantial relation to the public health, morals, order, or safety, or the general welfare. In brief, it must be *Page 770 
reasonably necessary to promote the accomplishment of a public good, or to prevent the infliction of a public harm. Skinner v. Thomas, 171 N.C. 98,87 S.E. 976, L.R.A. 1916 E, 338; Glenn v. Express Co., 170 N.C. 286,87 S.E. 136.
In consequence, a statute which prevents any person from engaging in any legitimate business, occupation, or trade cannot be sustained as a valid exercise of the police power unless the promotion or protection of the public health, morals, order, or safety, or the general welfare makes it reasonably necessary. Where the practice of a profession or calling requires special knowledge or skill and intimately affects the public health, morals, order, or safety, or the general welfare, the Legislature may prescribe reasonable qualifications for persons desiring to pursue such profession or calling, and require them to demonstrate their possession of such qualifications by an examination on the subjects with which such profession or calling has to deal as a condition precedent to the right to follow such profession or calling. S. v. Van Doran, 109 N.C. 864,14 S.E. 32; S. v. Call, 121 N.C. 643, 28 S.E. 517;S. v. McKnight, 131 N.C. 717, 42 S.E. 580, 59 L.R.A. 187;In re Applicants for License, 143 N.C. 1, 55 S.E. 635, 10 L.R.A. (N.S.) 288, 10 Ann. Cas. 187; S. v. Hicks, 143 N.C. 689,57 S.E. 441; St. George v. Hardie, 147 N.C. 88,60 S.E. 920; Allen v. Carr, 210 N.C. 513, 187 S.E. 809; 16 C. J. S., Constitutional Law, section 669; 11 Am. Jur., Constitutional Law, section 275. But it is otherwise with respect to the ordinary lawful and innocuous occupations of life. They must be open to all alike upon the same terms. While it may adopt such regulations relating thereto as are reasonably necessary to promote the accomplishment of a public good or to prevent the infliction of a public harm, the Legislature can neither deny nor unreasonably curtail the common right secured to all men by Sections 1 and 17 of Article I of the State Constitution to maintain themselves and their families by the pursuit of the usual legitimate and harmless occupations of life. S.v. Harris, supra.
Photography is an honored calling which contributes much satisfaction to living. Like all honest work, it is ennobling. In the economy of nature, toil is necessary to support human life, and essential to develop the human spirit. The great sculptor, Michelangelo, spoke a profound truth applicable to all mankind in uttering the cryptic phrase, "It is only well with me when I have a chisel in my hand."
When all is said, photography is one of the many usual legitimate and innocuous vocations by which men earn their daily bread. It is, in essence, a private business unaffected in a legal sense with any public interest.
The arguments advanced to sustain the statute in question as a valid exercise of the police power are without convincing force for reasons so *Page 771 
ably stated in the dissenting opinion in S. v. Lawrence, supra, and in the majority opinion in S. v. Harris, supra. While there may be some fire risk incident to the practice of photography on account of combustible materials employed, such hazard is certainly no greater than that inseparable from the things utilized daily in the home and in scores of other vocations. Any danger incidental to the practice of photography may threaten injury to the individual practitioner, but it does not imperil the public safety.
It is undoubtedly true that the photographer must possess skill. But so must the actor, the baker, the bookbinder, the bookkeeper, the carpenter, the cook, the editor, the farmer, the goldsmith, the horseshoer, the horticulturist, the jeweler, the machinist, the mechanic, the musician, the painter, the paper-hanger, the plasterer, the printer, the reporter, the silversmith, the stonecutter, the storekeeper, the tailor, the watchmaker, the wheelwright, the woodcarver, and every other person successfully engaged in a definitely specialized occupation, be it called a trade, a business, an art, or a profession. Yet, who would maintain that the Legislature would promote the general welfare by requiring a mental and moral examination preliminary to permitting individuals to engage in these vocations merely because they involve knowledge and skill?
It is urged, finally, that restricting the practice of photography to those whose competency and integrity is certified by a board of professional photographers will accomplish a public good because unskilled photographers may impose inferior pictures upon their customers, and dishonest photographers may practice fraud upon those who deal with them. The initial defect in this argument is that it runs counter to the economic philosophy generally accepted in this country that ordinarily the public is best served by the free competition of free men in a free market. To be sure, a dishonest photographer may defraud those with whom he deals. So may a dishonest person in any other calling. Indeed, fraud has been practiced on occasion in all relations of life since the serpent invaded Eden and misrepresented the qualities of the forbidden fruit to the woman. Under this statute, the Board of Photographic Examiners may refuse to license any applicant who fails to satisfy the Board as to his moral character, and may revoke the license of any licensed photographer whose practice may offend the undefined ethical standards of the Board. G.S. 92-11, 92-23. We concur in what the Court of Appeals of Kentucky said in a somewhat similar case: "In our opinion, the right to earn one's daily bread cannot be made to hang on so narrow a thread. Broad as is the police power, its limit is exceeded when the State undertakes to require moral qualifications of one who wishes to engage or continue in a business which, as usually conducted, is no more dangerous to the public than any other ordinary occupation of life." Rawlesv. Jenkins, 212 Ky. 287, 279 S.W. 350. *Page 772 
When Chapter 92 of the General Statutes is laid alongside the relevant legal authorities and principles, it is plain that it is not a valid exercise of the police power of the State, and that it violates the constitutional guaranties securing to all men the right to "liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness" and providing that no person is to be deprived of "liberty or property, but by the law of the land." It unreasonably obstructs the common right of all men to choose and follow one of the ordinary lawful and harmless occupations of life as a means of livelihood, and bears no rational, real, or substantial relation to the public health, morals, order, or safety, or the general welfare. Instead, it is addressed to the interests of a particular class rather than the good of society as a whole, and tends to promote a monopoly in what is essentially a private business. In so doing, it offends the additional constitutional guaranty that "Monopolies are contrary to the genius of a free state and ought not to be allowed." Const. 1776, Declaration of Rights, Art. XXIII; Const. 1868, Art. I, section 31.
For the reasons given, Chapter 92 of the General Statutes is adjudged void for repugnancy to Article I, sections 1, 17, and 31 of the State Constitution, and the decision in S. v. Lawrence, supra, to the contrary is overruled. It follows that there was error in holding the defendant guilty. The special verdict required that a verdict of not guilty be entered and the accused discharged. Hence, the judgment rendered below is
Reversed.