IN THE SUPREME COURT OF NORTH CAROLINA

No. 280PA22

Filed 23 August 2024

KODY KINSLEY, in his official capacity as SECRETARY OF THE NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES

v.

ACE SPEEDWAY RACING, LTD., AFTER 5 EVENTS, LLC, 1804-1814 GREEN STREET ASSOCIATES LIMITED PARTNERSHIP, JASON TURNER, and ROBERT TURNER

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 284 N.C. App. 665 (2022), affirming an order entered on 12 January 2021 by Judge John M. Dunlow in Superior Court, Alamance County. Heard in the Supreme Court on 7 November 2023.

*Joshua H. Stein, Attorney General, by Ryan Y. Park, Solicitor General, James W. Doggett, Deputy Solicitor General, Nicholas S. Brod, Deputy Solicitor General, James W. Whalen, Solicitor General Fellow, John P. Barkley, Special Deputy Attorney General, and Hyrum J. Hemingway, Assistant Attorney General, for plaintiff-appellant.*

*Kitchen Law, PLLC, by S.C. Kitchen, for defendants-appellees, After 5 Events, LLC, Jason Turner, and Robert Turner.*

*Ivy A. Johnson and Kristi L. Graunke for ACLU of North Carolina Legal Foundation, amicus curiae.*

*Maynard Nexsen PC, by David S. Pokela and John Mabe, for Association of State and Territorial Health Officials, amicus curiae.*

*Teague Campbell Dennis & Gorham, by James M. Stanley, Jr. and Matthew W. Skidmore, for North Carolina Association of Local Health Directors, amicus curiae.*

*Institute for Justice, by Joshua Windham; and Stam Law Firm, by Daniel Gibson, for Jay Singleton, D.O. and Singleton Vision Center, P.A., amici curiae.*

DIETZ, Justice.

In the early days of the COVID-19 pandemic, Governor Roy Cooper declared a state of emergency and issued an executive order affecting outdoor venues such as stadiums, concert arenas, and racetracks. The executive order permitted these venues to stay open but limited attendance to only twenty-five people, regardless of the venue's size.

Robert Turner, who operated a racetrack in Alamance County known as Ace Speedway, spoke out against these restrictions and told the public that his racetrack would remain open for all attendees. This led to the series of events at issue in this lawsuit.

These events concern matters that are controversial in contemporary politics. The legal issues in this appeal, by contrast, are so time-tested that they border on mundane. In our legal system, we treat the initial allegations in a lawsuit as true when assessing whether the case can move forward at the outset. It is only after the parties have had the opportunity to gather evidence—from each other, and from other parties with knowledge about the case—that courts examine whether those allegations are true.

Here, the claims at issue allege that Governor Cooper took a series of "unusual

steps" to single out and shut down Ace Speedway—first by pressuring the local sheriff to arrest Turner and, when the sheriff refused, ordering public health officials to shut down Ace Speedway as a health hazard. The claims also allege that Governor Cooper took these actions not because there was an actual health hazard at the racetrack, but to punish Turner for speaking out, and that health officials did not take similar actions against other large outdoor venues whose owners did not openly criticize the Governor.

We emphasize that these allegations remain unproven. After all, the case has barely begun. Still, as explained below, these allegations assert colorable claims under the North Carolina Constitution for which there is no alternative remedy. As a result, at this stage of the case, the trial court properly denied the State's motion to dismiss. We affirm the decision of the Court of Appeals, which in turn affirmed the trial court's ruling.

**Facts and Procedural History**

The following statement of facts is taken from the counterclaims asserting constitutional violations. Under the applicable standard of review, we take these unproven allegations as true for purposes of our review. *Deminski v. State Bd. of Educ.*, 377 N.C. 406, 412 (2021).

In early March 2020, Governor Roy Cooper declared a state of emergency in response to the COVID pandemic. On 20 May 2020, the Governor invoked his emergency authority to issue Executive Order 141. That order temporarily prohibited

all "mass gatherings." The order defined a mass gathering as "an event or convening that brings together more than ten (10) people indoors or more than twenty-five (25) people outdoors at the same time in a single confined indoor or outdoor space, such as an auditorium, stadium, arena, or meeting hall." Exec. Order No. 141, 34 N.C. Reg. 2360 (May 20, 2020).

The executive order applied to Ace Speedway, a large outdoor racetrack in Alamance County. Shortly after the Governor announced the executive order, one of Ace Speedway's owners, Robert Turner, publicly announced that that racetrack would remain open and "have people in the stands."

Turner explained that "unless they can barricade the road, I'm going to do it. The racing community wants to race. They're sick and tired of the politics. People are not scared of something that ain't killing nobody. It may kill .03 percent, but we deal with more than that every day, and I'm not buying it no more."

As Turner indicated, Ace Speedway hosted its first race of the season on 23 May 2020, shortly after the executive order took effect. That event exceeded the 25-person attendance limit at the racetrack.

Ace Speedway had a second race scheduled for the following week. After learning that the speedway did not comply with the executive order, the Governor reached out to Alamance County Sheriff Terry Johnson. The Governor asked the Sheriff to meet with Ace Speedway and convince the speedway to postpone the upcoming race. As requested, Sheriff Johnson met with Ace Speedway. Nevertheless,

the speedway hosted its second race as planned. Following that race, Sheriff Johnson announced that he would not take any further steps to enforce the executive order, citing concerns with the order's constitutionality.

On 5 June 2020, the Governor sent a letter to the Alamance County Commissioners and to Sheriff Johnson explaining that the races at Ace Speedway violated the executive order and were criminal acts subject to enforcement by local law enforcement officers. The letter warned that if Sheriff Johnson refused to "do his duty" and enforce the executive order, the Governor would take further action.

The letter did not stop Ace Speedway from hosting its third race of the season in early June. Following that third race, the Secretary of the North Carolina Department of Health and Human Services issued an abatement order that required Ace Speedway to close its operations as an "imminent hazard" to public health. The abatement order required Ace Speedway to notify the public that the upcoming races and events at the facility were canceled and confirm in writing to DHHS that the public had been notified of the racetrack's closure.

Other large venues across the State also permitted more than 25 people to attend their events in violation of the emergency order, but DHHS only issued an abatement order against Ace Speedway. DHHS did not take similar enforcement action against other venues that had not spoken out against Governor Cooper's policies.

Ace Speedway refused to comply with the abatement order. Just days later,

DHHS filed a lawsuit. The complaint named Ace Speedway and its owners and operators as defendants.[1] It sought a declaratory judgment that Ace Speedway violated the abatement order and that the State was entitled to an injunction forcing it to comply.

After a hearing, the trial court issued a preliminary injunction prohibiting Ace Speedway from conducting races and other events at its facilities until it complied with the terms of the abatement order.

As the lawsuit progressed, Ace Speedway and its operators answered the complaint and asserted counterclaims against the State for violation of their constitutional right to earn a living and to be free from selective enforcement of the law.

Later in the year, as the lawsuit continued, the Governor replaced Executive Order 141 with a new executive order that loosened restrictions on mass gatherings. DHHS concluded that this extinguished the existing abatement order. DHHS therefore voluntarily dismissed its claims against Ace Speedway. The State also moved to dismiss the counterclaims on the ground that those claims were barred by sovereign immunity.

The trial court denied the motion to dismiss and the State appealed. The Court of Appeals affirmed the trial court's order denying the motion. This Court allowed the State's petition for discretionary review of that decision.

---

[1] For ease of reading, we will refer to the defendants collectively as "Ace Speedway."

**Analysis**

### I. Standard of Review

We begin our analysis with the appropriate standard of review. The State appealed the trial court's denial of a motion to dismiss based on sovereign immunity. Ordinarily, a court's analysis of sovereign immunity focuses not on the merits of the plaintiff's claim, but on whether the State has "consented or waived its immunity" to being sued. *Est. of Graham v. Lambert*, 385 N.C. 644, 651 (2024).

But here, the analysis is different because of the nature of the claims. Ace Speedway brought two claims for violations of rights in the North Carolina Constitution. These constitutional claims are known as "*Corum* claims." *See Corum v. Univ. of N.C.*, 330 N.C. 761 (1992). This Court created *Corum* claims because of the time-honored principle that where there is a right, there is a remedy. *Washington v. Cline*, 385 N.C. 824, 825 (2024). "To ensure that every right does indeed have a remedy in our court system, *Corum* offers a common law cause of action when existing relief does not sufficiently redress a violation of a particular constitutional right." *Askew v. City of Kinston*, 902 S.E.2d 722, 728 (2024) (cleaned up).

Importantly, the State cannot assert sovereign immunity as a defense to a valid *Corum* claim. As we explained in *Corum*, when there is "a clash between these constitutional rights and sovereign immunity, the constitutional rights must prevail." *Corum*, 330 N.C. at 786. Thus, sovereign immunity "cannot stand as a barrier" to a *Corum* claim. *Id.* at 785.

But it is not enough for a claimant to simply *assert* that a claim is valid under *Corum*. We have acknowledged that, to pierce the State's sovereign immunity at the outset, the complaint must "sufficiently allege" a *Corum* claim. *Deminski*, 377 N.C. at 407.

In *Deminski,* we outlined three criteria necessary to sufficiently allege a *Corum* claim. First, the complaint must allege that a state actor violated the claimant's state constitutional rights. *Id.* at 413. Second, "the claim must be colorable," meaning that the claim "must present facts sufficient to support an alleged violation of a right protected by the State Constitution." *Id.* Third, there must be no other "adequate state remedy" for this alleged constitutional violation. *Id.* If a claimant satisfies these three criteria, sovereign immunity "does not bar the claim" and the trial court must deny a motion to dismiss based on sovereign immunity. *Id.* at 407.

Much of our recent *Corum* jurisprudence has focused extensively on whether there was an adequate alternative remedy. *See, e.g.*, *Askew,* 902 S.E.2d at 733; *Washington*, 385 N.C. at 825. Here, though, the State does not dispute that Ace Speedway has no adequate alternative remedy because there is no other forum in which it could seek relief for these constitutional violations. We agree. Likewise, the State does not dispute that the complaint alleges state actors violated the state constitution. Again, we agree.

Thus, the first and third criteria of the test we set out in *Deminski* are satisfied. The State's arguments (and, as a result, this entire appeal) focuses solely on the

second criteria—whether Ace Speedway asserted a "colorable claim" under the state constitution.

As we made clear in *Deminski*, at the motion to dismiss stage, whether a claim is "colorable" focuses entirely on the allegations in the complaint. *Deminski*, 377 N.C. at 412. Those allegations are "treated as true" and the Court examines whether the allegations, if proven, constitute a violation of a right protected by the North Carolina Constitution. *Id*. We therefore examine each of Ace Speedway's constitutional claims and assess whether the allegations assert colorable constitutional claims.

## II.    Fruits of Their Labor Clause

We begin with Ace Speedway's claim that the State deprived the speedway and its owners of their inalienable right to earn a living guaranteed by the provision of Article I, Section 1 of the North Carolina Constitution known as the "Fruits of Their Labor Clause."

Article I, Section 1 provides as follows: "We hold it to be self-evident that all persons are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness." N.C. Const. art. I, § 1.

This language, added in our state's 1868 constitution, "borrowed certain phraseology from the Declaration of Independence." *State v. Ballance*, 229 N.C. 764, 768 (1949). But the framers also added something new, described in *Ballance* as an "interpolation"—the people's inalienable right to "the enjoyment of the fruits of their

own labor." *Id.*

We explained in *Ballance* that this added constitutional right protects people "engaging in any legitimate business, occupation, or trade." *Id.* at 770. It bars state action burdening these activities unless "the promotion or protection of the public health, morals, order, or safety, or the general welfare makes it reasonably necessary." *Id.*

Thus, to survive constitutional scrutiny under this provision, the challenged state action "must be reasonably necessary to promote the accomplishment of a public good, or to prevent the infliction of a public harm." *Id.* This test involves a "twofold" inquiry: "(1) is there a proper governmental purpose for the statute, and (2) are the means chosen to effect that purpose reasonable?" *Poor Richard's, Inc. v. Stone*, 322 N.C. 61, 64 (1988).

The first step in this inquiry requires the reviewing court to identify the State's actual purpose for the constraint on private business activity. Initially, the State may simply assert that purpose, without the need to "come forward with evidence" proving that it is, indeed, the true purpose. *Id.* at 66. But the plaintiff may rebut that assertion with evidence demonstrating that the State's asserted purpose is not the true one, and instead the State is pursuing a different, unstated purpose. *Id.*

For example, in *Roller v. Allen*, the State defended licensing requirements for ceramic tile installers by asserting that they were necessary to combat consumer fraud by unqualified workers. 245 N.C. 516, 521–23 (1957). After reviewing the

evidence, this Court rejected that assertion, holding that the statute's "main and controlling purpose" was "not health, not safety, not morals, not welfare, but a tight control of tile contracting in perpetuity by those already in the business." *Id.* at 525. Simply put, courts assess Fruits of Their Labor Clause claims based on the *actual* purpose of the state action, and that may not always be the purpose initially put forward by the State.

Once the actual purpose of the challenged state action is identified, the reviewing court must then assess whether that purpose is a "proper governmental purpose." *Poor Richard's*, 322 N.C. at 64. Proper purposes are those that "promote the accomplishment of a public good, or to prevent the infliction of a public harm." *Ballance*, 229 N.C. at 770. It is, of course, impossible to enumerate *every* public good or public harm. But our case law offers guidance on how to determine if a purpose is broad enough that it addresses public welfare generally, rather than private interests. *Id.* at 770–71.

In *Ballance*, for example, this Court rejected the notion that it was a public good to reduce "fire risk incident to the practice of photography on account of combustible materials employed." *Id.* at 771. That purpose was too narrow to serve the public welfare generally. It addressed only "the interests of a particular class rather than the good of society as a whole." *Id.* at 772.

Put another way, reducing fire risks for *all* members of the public is a proper governmental purpose. And, if a particular business activity poses a heightened risk

of fire hazards, regulating that specific activity may be a reasonable means of advancing the broader purpose, even if it only impacts a subset of the public. *See id.* But a proper governmental purpose must address the "public interest." Protecting the public from fire hazards is in the public interest. Protecting only *photography businesses* from fire hazards, with no concern for anyone else, is merely a regulation of "a private business unaffected in a legal sense with any public interest." *Id.* at 770.

If the reviewing court determines that the challenged state action serves a proper governmental purpose, the inquiry then reaches the second stage: "are the means chosen to effect that purpose reasonable?" *Poor Richard's*, 322 N.C. at 64. This is a fact-intensive analysis. "The means used must be measured by balancing the public good likely to result from their utilization against the burdens resulting to the businesses being regulated." *Id.* at 66.

This requires assessing two fact-specific questions—first, how effective is the state action at achieving the desired public purpose and, second, how burdensome is that state action to the targeted businesses. The analysis then becomes "a question of degree"—given all the options available to the state to advance the governmental purpose, was it reasonable for the state to choose this approach, with its corresponding benefits and burdens? *Id.*

Having laid out the appropriate test for a Fruits of Their Labor Clause claim, we now turn to whether the Court of Appeals erred when it held that Ace Speedway sufficiently alleged a colorable claim under that provision. At this point, we circle

back to the standard of review described above. We treat the allegations in the complaint as true and examine whether, if those allegations are proven, Ace Speedway would prevail under the two-step inquiry for a Fruits of Their Labor Clause claim. *See Deminski*, 377 N.C. at 412.

We begin with the first step of the test. The State contends that there "can be little question that the order seeks to achieve 'a proper governmental purpose'" because "protecting North Carolinians from a novel virus—a virus that would eventually kill over one million Americans" is a proper governmental purpose.

But this ignores the central allegation in Ace Speedway's claim—that the purpose of the abatement order was not to protect public health, but to retaliate against Ace Speedway for criticizing the Governor. Ace Speedway alleges that it was "singled out by the Governor for enforcement" because it spoke out against the Governor's emergency order, and that other businesses violating the emergency order were not subjected to similar enforcement action by the State. This allegation, if true, would establish that the State did not pursue a proper governmental purpose because its purpose was not to protect the public interest, but to punish a private business for standing up to the government.

At the motion to dismiss stage, we must accept Ace Speedway's allegation as true. *Deminski*, 377 N.C. at 412. Accordingly, Ace Speedway sufficiently alleged that the State's actions did not serve a proper governmental purpose.

We next turn to the second step of the test. Even if the State had a proper

governmental purpose, we must assess whether the means chosen to achieve that purpose were reasonable. The State argues that the abatement order was reasonably necessary to protect the public health because "large mass gatherings at places like racetracks presented an elevated risk for spreading COVID-19." The State further argues that the need to use the abatement order to shut down Ace Speedway stemmed from "the best scientific and medical knowledge available at the time" to prevent the spread of COVID-19.

But again, the State ignores the allegations in this constitutional claim. Ace Speedway alleges that other racetracks and similar businesses violated the same emergency order, yet none of those speedways faced similar enforcement action. *See Poor Richard's*, 322 N.C. at 66. Even if we accept the State's asserted purpose for the abatement order—protecting the public by stopping the spread of COVID-19—this would mean that the State sought to achieve this governmental purpose by issuing an abatement order shutting down a single business while choosing to ignore many others presenting identical risks to the public. This is a particularly ineffective means of achieving the asserted governmental interest, while simultaneously imposing a tremendous burden on Ace Speedway. In other words, balancing the benefits and the burdens of the State's approach, the State's decision to target Ace Speedway but ignore other businesses posing identical risks is not reasonable.

Again, these are merely allegations. But, at this stage, we must accept those allegations as true. *Deminski*, 377 N.C. at 412. Doing so, we conclude that, even

assuming the State had a proper governmental purpose, Ace Speedway sufficiently alleged that the means chosen by the State to achieve that purpose were unreasonable under the circumstances.

In sum, Ace Speedway has sufficiently alleged that the challenged state action fails both steps in the two-step analysis for a Fruit of Their Labor Clause claim. Accordingly, Ace Speedway asserted a colorable constitutional claim that pierces the State's sovereign immunity. The Court of Appeals properly affirmed the trial court's denial of the State's motion to dismiss this claim based on sovereign immunity.

### III. Equal Protection Clause

We next turn to Ace Speedway's claim that the abatement order was a form of unconstitutional selective enforcement in violation of the Equal Protection Clause in Article I, Section 19 of the North Carolina Constitution.

Ordinarily, the use of "some selectivity" when the government enforces the law is appropriate and not a violation of equal protection. *State v. Lawson*, 310 N.C. 632, 643 (1984). To establish that the State's selective enforcement violated the Equal Protection Clause, the claimant must show that the enforcement "was motivated by a discriminatory purpose and had a discriminatory effect." *State v. Garner*, 340 N.C. 573, 588 (1995). The "discriminatory purpose" prong requires a showing that the government consciously and deliberately based the enforcement on an "unjustifiable standard" or "arbitrary classification" such as race, religion, or the exercise of the claimant's constitutional rights. *State v. Ward*, 354 N.C. 231, 244 (2001). The

"discriminatory effect" prong requires a showing that the claimant has been singled out and treated differently "when compared to persons similarly situated." *Maines v. City of Greensboro*, 300 N.C. 126, 132 (1980). Satisfying this two-part test is necessary to overcome the presumption that public officials act in good faith when choosing how to enforce the law. *Id.*

As we repeatedly explained above, we assess whether Ace Speedway sufficiently alleged a colorable selective enforcement claim at this early stage of the proceeding by accepting the allegations as true and examining whether those allegations, if proven, satisfy the two-part test articulated in our case law. *See Deminski*, 377 N.C. at 412.

Ace Speedway satisfies this standard. The central allegations of this selective enforcement claim are that Robert Turner exercised his First Amendment rights by openly criticizing Governor Cooper's emergency order. In response to that protected First Amendment activity, according to the allegations, Ace Speedway was "singled out by the Governor for enforcement."

Ace Speedway alleges that the Governor "took the unusual step of having a letter sent to the Sheriff of Alamance County directing him to take action" against the speedway and its operators. When the Sheriff refused, the State targeted the speedway with the abatement order. This was done, according to Ace Speedway's allegations, because of Robert Turner's public statements criticizing the Governor. Other, similarly situated racetracks did not face enforcement action even though the

State knew that they, too, were violating the emergency order.

These allegations, if proven, would establish that the State acted with the discriminatory purpose of retaliating against Robert Turner's valid exercise of his First Amendment rights, and that the enforcement had the discriminatory effect of harming Ace Speedway while other, similarly situated businesses faced no consequences for the same violations of the emergency order. *See Garner*, 340 N.C. at 588. Thus, Ace Speedway asserted a colorable selective enforcement claim that pierces the State's sovereign immunity. The Court of Appeals properly affirmed the trial court's denial of the State's motion to dismiss this claim as well.

### IV. Least Intrusive Remedy Criteria

At the close of its new brief to this Court, the State also argues that, even if Ace Speedway asserted colorable constitutional claims, those claims "fail for an independent, alternative reason as well: Money damages are not the least-intrusive remedy for the constitutional violations."

This argument is not appropriate at this stage of the proceeding. In *Corum*, we held that, when adjudicating these constitutional claims, "the judiciary must recognize two critical limitations." *Corum*, 33 N.C. at 784. "First, it must bow to established claims and remedies where these provide an alternative to the extraordinary exercise of its inherent constitutional power." *Id.* "Second, in exercising that power, the judiciary must minimize the encroachment upon other branches of government—in appearance and in fact—by seeking the least intrusive remedy

-17-

available and necessary to right the wrong." *Id.*

These two "critical limitations" arise at separate stages of a *Corum* action. As explained above, the first of these critical limitations—the adequate remedy prong—is incorporated into the test for alleging a valid *Corum* claim. *Deminski*, 377 N.C. at 407. It is effectively "an element" of the constitutional claim. *Askew*, 902 S.E.2d at 733. As a result, the analysis of whether the claimant has an adequate, alternative remedy can occur when a *Corum* claim is first asserted. *Id.* If there is an alternative remedy, the *Corum* claim is infirm and must be dismissed.

By contrast, the second critical limitation—that the *Corum* court must choose "the least intrusive remedy available and necessary to right the wrong"—arises *after* the claimant proves a constitutional violation. *Corum*, 330 N.C. at 784. *Corum* permits the judiciary to "exercise its inherent constitutional power to fashion a common law remedy for a violation of a particular constitutional right." *Id.* That remedy "will depend upon the facts of the case developed at trial. It will be a matter for the trial judge to craft the necessary relief." *Id.*

Thus, the second limitation identified in *Corum* is intended as a restraint on the scope of relief available to a successful *Corum* claimant. *Corum* ensures that claimants can obtain "remedies that are meaningful, even if not necessarily complete or the relief they want." *Washington*, 385 N.C. at 830. Thus, even in cases where the claimant seeks money damages, the trial court, at the conclusion of the case, may need "to fashion a common law remedy less intrusive than money damages." *Corum*,

330 N.C. at 785. What remedy is both least-intrusive and sufficient to provide meaningful relief is a question that can be answered only after fact issues are resolved and the claim is proven.

Accordingly, we reject the State's argument that Ace Speedway's claims fail because the claims do not seek the least-intrusive remedy. That argument is not ripe for review. As we have repeated throughout this opinion, Ace Speedway's allegations remain unproven. The case has barely begun. The only question reviewable at this early stage of the case is whether Ace Speedway has sufficiently alleged a valid *Corum* claim, thus piercing the State's sovereign immunity and permitting it to bring the State into court to litigate the matter.

The trial court correctly concluded that the claims are valid and therefore the State's motion to dismiss must be denied. The Court of Appeals, in turn, properly affirmed that ruling.

## Conclusion

We affirm the decision of the Court of Appeals.

AFFIRMED.