IN THE SUPREME COURT OF NORTH CAROLINA

No. 126PA24

Filed 22 August 2025

NORTH CAROLINA BAR AND TAVERN ASSOCIATION; et al.

v.

JOSHUA H. STEIN,[1] in his official capacity as Governor of North Carolina

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 293 N.C. App. 402 (2024), affirming in part and reversing in part an order entered on 29 March 2022 by Judge James L. Gale in Superior Court, Wake County. On 5 June 2024 the Supreme Court allowed plaintiffs' conditional petition for discretionary review as to additional issues. Heard in the Supreme Court on 23 October 2024.

*Stevens Martin Vaughn & Tadych, PLLC, by Michael J. Tadych, K. Matthew Vaughn, and Robert F. Orr, for plaintiff-appellees.*

*Jeff Jackson, Attorney General, by James W. Doggett and Nicholas S. Brod, Deputy Solicitors General, and Amar Majmundar and Matthew Tulchin, Special Deputy Attorneys General, for defendant-appellant.*

BERGER, Justice.

---

[1] At all relevant times herein, Roy Cooper was Governor of North Carolina, and actions taken by him in that capacity are the subject matter of plaintiffs' claims. Joshua Stein was elected Governor in 2024, and pursuant to Rule 38 of the Rules of Appellate Procedure, the caption of this action has been amended to reflect this change. Similarly, Jeff Jackson has been elected Attorney General, necessitating amendment to the attorney listing.

Plaintiffs are a group of bar owners and employees from across North Carolina who challenge a series of executive orders entered by defendant-Governor Roy Cooper. According to the trial court, Cooper's executive orders restricted full operation of plaintiffs' establishments for over 400 days while permitting other businesses to reopen. Plaintiffs argue that the closure and differing treatment violated constitutional and statutory guarantees. Governor Cooper contends that the measures were based on science and data and were necessary responses to an ongoing emergency.

But even in a declared emergency, the powers of those who act on behalf of the people have limits, and the citizens of this state rejected "because I said so" governance long ago. However well-intentioned government actors may be, they are constrained by the enduring commands of the Constitution; and constitutional guarantees cannot be suspended in this state by executive fiat.

This Court recently confronted similar issues in *Kinsley v. Ace Speedway Racing, Ltd.*, 386 N.C. 418, 423 (2024). There, we addressed claims that COVID regulations imposed by the Governor violated the Fruits of Labor and Equal Protection Clauses in our State Constitution. *Id.* at 424–29. Based on our precedent in *State v. Ballance*, 229 N.C. 764 (1949), we unanimously established a workable Fruits of Labor test and clarified that rational basis review is not the appropriate standard for Fruits of Labor claims. *Id.* at 424–26.

Plaintiffs here, like the plaintiff in *Ace Speedway*, have stated colorable claims under the North Carolina Constitution. But this case presents a slightly different question: whether the trial court's entry of summary judgment in favor of the Governor was proper. Because our Fruits of Labor test is a fact intensive inquiry, we agree with the Court of Appeals that the trial court erred when it entered summary judgment. However, the Court of Appeals incorrectly applied rational basis review to the Fruits of Labor claim. As discussed further herein, because the Court of Appeals did not have the benefit of our decision in *Ace Speedway* when it issued its opinion in this case, and we modify and affirm in part the vacatur of the trial court's order, and remand to the trial court.

Plaintiffs also advanced an Equal Protection claim pursuant Article I, § 19 of the State Constitution. On this issue, the trial court applied rational basis review and dismissed the claim. The Court of Appeals reversed, applying strict scrutiny in its analysis. We reverse the Court of Appeals because our precedent states that the proper scrutiny for economic regulations under the Equal Protection Clause not based upon suspect classification is rational basis.[2]

In addition, plaintiffs asserted statutory claims for violations of the Emergency Management Act and Public Records Act. For the reasons set forth herein, plaintiffs have failed to establish that they qualify for recovery under the Emergency

---

[2] Plaintiffs also asserted claims for constitutional and regulatory takings. Although the Court of Appeals addressed these claims in its opinion, plaintiffs failed to seek review of these issues in their conditional petition for discretionary review.

Management Act, and they have failed to establish jurisdiction for their Public Records Act claim and associated demand for attorneys' fees. We, therefore, affirm the Court of Appeals in affirming the trial court on these statutory claims.

## I. Factual and Procedural Background

On 17 March 2020, Governor Roy Cooper issued Executive Order No. 118 entitled "Limiting Operations of Restaurants and Bars and Broadening Unemployment Insurance Benefits in Response to COVID-19." Exec. Order No. 118, 34 N.C. Reg. 1834 (Mar. 17, 2020). This action closed bars entirely and limited food and beverage operations for restaurants. *Id.* Bars were defined in Executive Order No. 118 as "establishments that are not restaurants and that have a permit to sell alcoholic beverages for onsite consumption, under N.C. Gen. Stat. § 18B-1000(1)."[3] *Id.* at 1837. Plaintiffs' businesses qualify as bars under the executive order.

A "stay at home" directive was entered in Executive Order No. 121 which closed non-essential businesses. Exec. Order No. 121, 34 N.C. Reg. 1903 (Mar. 27, 2020). Restaurants were determined to be essential by Governor Cooper and were permitted to continue limited operations while bars were to remain closed. *Id.* Subsequent orders extended the closure, but by May 2020, phased reopening began.

---

[3] Restaurants were defined in Executive Order No. 118 as "permitted food establishments, under N.C. Gen. Stat. § 130A-248, and other establishments that both prepare and serve food, including but not limited to, restaurants, cafeterias, food halls, dining halls, food kiosks at airports and shopping centers, or educational institutions, ('food courts'), as well as private or members-only clubs where food and beverages are permitted to be consumed on premises." Exec. Order No. 118, 34 N.C. Reg. at 1836.

Phase 1 allowed restaurants to remain open under restrictions but continued the prohibition on operation by plaintiffs' establishments. Exec. Order No. 138, 34 N.C. Reg. 2141 (May 5, 2020). The Phase 2 reopening plan in Executive Order No. 141 permitted restaurants, tattoo parlors, breweries, wineries, distilleries, taprooms, bars in hotels, and other establishments to reopen under capacity limitations and other prescribed rules. Exec. Order No. 141, 34 N.C. Reg. 2360 (May 20, 2020). But bars were again excluded from the reopening because they purportedly posed a greater risk of the spread of COVID when compared to other businesses. *Id.*

Following entry of Executive Order No. 141, Governor Cooper held a press conference in which he stated that continued restriction on bars was justified based on data, science, and daily information received from doctors and other healthcare experts.

In a sworn declaration provided to the trial court, Department of Health and Human Services Secretary Mandy Cohen justified the "dimmer switch" approach to phased reopening, stating that the "[r]isk is higher in spaces like bars, where people's pre-COVID learned behavior involves high-risk activities," and that their approach was "data driven." Secretary Cohen further stated that a leading consideration in the differing treatment was "the positive economic impact" that wineries and

breweries produced, and that "the State has a strong economic interest in sustaining them."[4]

Plaintiffs made a public records request seeking the information Governor Cooper had referenced in the press conference and thereafter filed suit. Plaintiffs sought an injunction which would have enabled them to operate their businesses and specifically alleged that there was no meaningful distinction between private bars which were not permitted to operate under Governor Cooper's executive orders, and bars in restaurants, hotels, distilleries, wineries, breweries, private clubs, and other establishments.[5] The executive orders, according to plaintiffs, violated the North Carolina Constitution's Fruits of Labor and Equal Protection Clauses. Plaintiffs also asserted claims for constitutional and regulatory takings, and statutory claims under the Emergency Management Act and Public Records Act. Following the initiation of suit, Governor Cooper supplied information responsive to plaintiffs' public records request.

The trial court denied plaintiffs' request for a preliminary injunction on 26 June 2020. Thereafter, Governor Cooper moved to dismiss plaintiffs' suit for lack of personal and subject matter jurisdiction, and for failure to state a claim upon which

---

[4] Another sworn declaration which provided justification for the differing treatment was from Mr. Wit Tuttell, then vice-president for tourism and marketing with the Economic Development Partnership of North Carolina. He stated that wineries and breweries were more important drivers of the tourism industry in the state than bars.

[5] Several plaintiff bar owners provided affidavits to the trial court which outlined plans to open with limited capacity and in accordance with the executive orders.

relief can be granted. Plaintiffs subsequently moved for partial summary judgment. A hearing was held and the trial court entered an order allowing Governor Cooper's motion to dismiss and denying plaintiffs' motion for partial summary judgment.

In reaching its decision on the Governor's motion to dismiss, the trial court indicated that it considered evidence and information outside of the pleadings. With regard to plaintiffs' state constitutional claims under the Fruits of Labor and Equal Protection Clauses, the trial court analyzed whether Governor Cooper "acted with a proper government purpose" and "whether [those] actions were reasonable." The trial court determined that because the executive orders were based on scientific data and learned professional commentary, and because plaintiffs had not demonstrated that Governor Cooper's use of the police powers was unreasonable, plaintiffs could not proceed with their *Corum* claim. As a result, the trial court dismissed plaintiffs' constitutional claims and denied plaintiffs' motion for partial summary judgment.

On the statutory claims, the trial court dismissed the Emergency Management Act claim because there was "no evidentiary or legal basis to conclude that [plaintiffs'] interests were 'commandeered, seized, taken, condemned, or otherwise used in coping with an emergency' within the statute's scope."

In considering the Public Records Act claim, the trial court found that plaintiffs had satisfied jurisdictional concerns by requesting mediation pursuant to N.C.G.S. § 7A-38.3E. But because Governor Cooper produced the requested records after the filing of the complaint and plaintiffs never sought a hearing on their request or

otherwise argued that defendant failed to comply with the request, the trial court dismissed the claim. Plaintiffs' request for attorneys' fees related to their Public Records Act claim, therefore, failed and was dismissed. Plaintiffs appealed.

On the state constitutional claims, the Court of Appeals determined that the trial court had converted defendant's motion into one for summary judgment because it considered evidentiary materials beyond the pleadings. *N. Carolina Bar & Tavern Ass'n v. Cooper*, 293 N.C. App. 402, 409 (2024). The Court of Appeals concluded that the trial court erred in entering summary judgment, vacated the order, and remanded the matter to the trial court. *Id.* at 423. Although not explicitly stated, the Court of Appeals implied that genuine issues of material fact existed because the "articles and data submitted by [d]efendant entirely fail to address any differences in the risk of spread of COVID-19 between the bars he allowed to reopen and [p]laintiffs' bars which remained closed." *Id.* at 423.

The Court of Appeals' reasoning on these claims was somewhat intertwined and overlapping. Concerning the Fruits of Labor claim, the Court of Appeals stated that it applied rational basis review and determined that because the record lacked scientific evidence to support the proposition that bars posed a greater of a risk than other establishments, "the unequal treatment of [p]laintiffs . . . was illogical and not rationally related to [Governor Cooper's] stated objective of slowing the spread of COVID-19," *id.*, and that Governor Cooper's executive orders lacked sufficient relation to "public health, morals, order, or safety, or the general welfare." *Id.* at 418–

19 (quoting *State v. Ballance*, 229 N.C. 764, 772 (1949)). On this claim, the Court of Appeals vacated the trial court's denial of summary judgment and remanded for reconsideration in light of their analysis. *Id.* at 423.

In coming to this conclusion, the Court of Appeals found the record did "not reveal the existence of any scientific evidence demonstrating [p]laintiffs' bars, as opposed to the bars located in other establishments serving alcohol, posed a heightened risk at the time Executive Order No. 141 was issued." *Id.* at 421. Thus, the lower court reasoned that the Governor's actions had the effect of denying plaintiffs the fundamental right to earn a living. *Id.* at 426–27.

On plaintiffs' Equal Protection claim, the Court of Appeals applied strict scrutiny and concluded that Executive Order No. 141 was underinclusive because it excluded bars from the phased reopening when restaurants and other seemingly similar businesses that served alcohol were allowed to reopen. *Id.* at 427. This unequal treatment, according to the Court of Appeals, was an "illogical and arbitrary [ ] attempt to achieve [d]efendant's stated health outcomes by applying different reopening standards to similarly situated businesses that could have complied with those standards." *Id.*

The Court of Appeals affirmed the trial court on plaintiffs' remaining claims. *Id.* Under the Emergency Management Act, the lower court determined that plaintiffs could not prevail under the plain language of the Act because Governor Cooper did not "take or otherwise use [p]laintiffs' land during a declared state of

emergency." *Id.* at 413 (emphasis omitted). In addition, the Court of Appeals determined that the trial court erred when it concluded that it had jurisdiction over plaintiffs' Public Records Act claim because plaintiffs failed to comply with mediation as required by the Act. *Id.* at 425–26.

Governor Cooper filed a petition for discretionary review with this Court on plaintiffs' Fruits of Labor and Equal Protection claims. We allowed review, and he argues that (1) sovereign immunity precludes plaintiffs' claims because damages are not the least intrusive remedy and allowing plaintiffs' *Corum* claim to proceed violates *Washington v. Cline*, 385 N.C. 824 (2024); (2) the plaintiffs failed to state a colorable constitutional claim under *Deminski v. State Bd. of Educ.*, 377 N.C. 406 (2021); and (3) the Court of Appeals erred in applying strict scrutiny to plaintiffs' Fruits of Labor and Equal Protection claims.

Factually, Governor Cooper asserts that public health concerns provided sufficient cause to justify the governmental action. He argues that the means used—targeted, phased reopening—were reasonable in light of the science and data available. He argues that second-guessing his decisions would inhibit the State's ability to act in future emergencies. In addition, Governor Cooper contends that his phased reopening plan was rationally related to reducing aggregate transmission risk because private bars typically involve closer social interaction, louder environments, and later hours, contributing to higher transmission risk. The unequal regulatory treatment, he argues, was grounded in public health data and expert opinions.

Plaintiffs filed, in response, a conditional request for discretionary review of the lower court's decision concerning their Emergency Management Act and Public Records Act claims. We allowed review on each issue.

## II. Discussion

### A. State Constitutional Claims

Plaintiffs assert that Governor Cooper's executive orders violated their rights under the Fruits of Labor and Equal Protection Clauses. The Governor's actions, they contend, deprived them of the right to earn a living in a lawful occupation without sufficient justification. Plaintiffs have specifically alleged that they were arbitrarily singled out for closure while seemingly indistinguishable businesses were allowed to reopen and that no credible public health distinction justified the differing treatment.

Governor Cooper contends that sovereign immunity precludes plaintiffs' claims because damages are not the least intrusive remedy and allowing plaintiffs' *Corum* claim to proceed violates *Washington v. Cline*, 385 N.C. 824 (2024).

We note that many of the issues presented here are similar to those recently addressed in *Ace Speedway*. There, this Court expressly held that "the State cannot assert sovereign immunity as a defense to a valid *Corum* claim." *Ace Speedway*, 386 N.C. at 423. "*Corum* claims are constitutional claims for damages directly against the State," and the underlying justification for these claims is the theory that where there is a violation of a right, there should be some corresponding remedy.

*Washington*, 385 N.C. at 825 (2024).

For a *Corum* claim to survive, a plaintiff must satisfy three criteria: (1) allege that "a state actor . . . violated . . . constitutional rights," (2) present a colorable claim, and (3) "there must be no adequate state remedy." *Deminski*, 377 N.C. at 413. When all three are met, "sovereign immunity does not bar the claim and the trial court must deny a motion to dismiss based on sovereign immunity." *Ace Speedway*, 386 N.C. at 423 (cleaned up).

To be colorable, a plaintiff must "present facts sufficient to support an alleged violation of a right protected by the State Constitution." *Ace Speedway*, 386 N.C. at 423 (quoting *Deminski*, 377 N.C. at 413 (2021)). These "allegations are treated as true and the Court examines whether the allegations, if proven, constitute a violation of a right protected by the North Carolina Constitution." *Id.* at 424 (cleaned up).

The third *Deminski* prong concerns the existence of an adequate alternative state remedy. This consideration takes place in the *Deminski* analysis because it "is effectively 'an element' of the constitutional claim." *Ace Speedway,* 386 N.C. at 429 (citing *Askew v. City of Kinston*, 386 N.C. 286, 300 (2024)) (cleaned up).

There is a difference, however, in an *ex ante* determination as to the existence of an adequate state remedy to establish a *Corum* claim and fashioning a remedy once a violation has been proven at trial. On the front end, we simply ask whether another established route to court exists to address purported violations of constitutional rights.

The Governor's *Washington v. Cline* argument fails on this point. In that case, we held that plaintiffs' claim for damages could not proceed because, not only was there an established route to vindicate the constitutional violation there—dismissal of criminal charges—but the plaintiff had already received the existing remedy. *Washington*, 385 N.C. at 830–31. The *ex ante* determination there was dispositive.

But on the back end, when a plaintiff has successfully proven a constitutional violation at trial, courts must "bow to established claims and remedies where these provide an alternative to the extraordinary exercise of its inherent constitutional power." *Ace Speedway*, 386 N.C. at 429 (quoting *Corum v. University of North Carolina*, 330 N.C. 761, 784 (1992)). When not so constrained, courts are required to "minimize the encroachment upon other branches of government." *Id.* This minimal intrusion is accomplished through the least intrusive common law "remedy available and necessary to right the wrong." *Id.*

Put another way, when the law already provides a legal pathway to vindicate a constitutional violation, judges serve a gatekeeping function by precluding *Corum* claims that intrude upon the State's sovereign immunity. But when constitutional claims are proven at trial, in the absence of established claims and remedies, judges exercise inherent authority in crafting a meaningful remedy. *See Washington*, 385 N.C. at 830. A meaningful remedy is not necessarily one that makes plaintiff whole, and even when a claimant specifically seeks money damages, a trial court may need to fashion less intrusive remedy at the conclusion of the case. *Corum*, 330 N.C. at

785.

We are concerned here with *Deminski*'s *ex ante* determination as to the existence of an adequate state remedy for both state constitutional claims. As in *Ace Speedway*, plaintiffs have "no adequate alternative remedy because there is no other forum in which it could seek relief for these constitutional violations." *Ace Speedway*, 386 N.C. at 423.

The Governor argues that there was an adequate alternative remedy under the third *Deminski* prong because plaintiffs could have rushed to court and sought a preliminary injunction to stop the emergency orders from taking effect. This is a circular argument, because the only available cause of action in which to seek that preliminary injunction would have been the *Corum* claims at issue here, meaning there was no adequate alternative remedy. Thus, Governor Cooper's argument is not one concerning the availability of a remedy *other than* these *Corum* claims, but instead an argument about whether the remedies sought in these *Corum* claims are the least-intrusive ones. As noted above, that least-intrusive remedy analysis "arises after the claimant proves a constitutional violation." *Ace Speedway*, 386 N.C. at 429 (emphasis removed). Thus, the issue is "not ripe" for adjudication. *Id.* at 430.

### 1. *Fruits of Labor*

Our State Constitution provides explicit protections for the first principles of freedom: "We hold it to be self-evident that all persons are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are

life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness." N.C. Const. art. I, § 1. "This provision creates a right to conduct a lawful business or to earn a livelihood that is 'fundamental' for purposes of state constitutional analysis." *Treants Enters., Inc. v. Onslow County*, 83 N.C. App. 345, 354 (1986), *aff'd*, 320 N.C. 776 (1987). The mere interference with this fundamental right by government is all that is required for a violation. *See King v. Town of Chapel Hill*, 367 N.C. 400, 408 (2014) ("This Court's duty to protect fundamental rights includes preventing arbitrary government actions that *interfere* with the right to the fruits of one's own labor." (emphasis added)).

Our Fruits of Labor jurisprudence was recently addressed in *Ace Speedway,* where we unanimously reaffirmed that the Clause "bars state action *burdening* [economic] activities unless the promotion or protection of the public health, morals, order, or safety, or the general welfare makes it reasonably necessary." *Ace Speedway*, 386 N.C. at 424 (cleaned up) (emphasis added). Under our precedent, the challenged government action "must be reasonably necessary to promote the accomplishment of a public good, or to prevent the infliction of a public harm." *Id.* (quoting *Ballance*, 229 N.C. at 770).

The inquiry here requires the government to satisfy the two-pronged Fruits of Labor test enunciated in *Ace Speedway*. Courts must first determine whether there is a "proper governmental purpose" for the challenged action. *Id.* In answering this question, we initially look at the actual purpose proffered by the government for the

interference with economic activity, mindful that this "may not always be the purpose initially put forward by the State." *Id.* at 425. Plaintiffs, therefore, "may rebut that assertion with evidence demonstrating that the State's asserted purpose is not the true one, and instead the State is pursuing a different, unstated purpose." *Id.*

We then consider if the actual purpose is a proper governmental purpose. *Id.* A proper purpose is one that "addresses the public interest" and "promote[s] the accomplishment of a public good, or . . . prevent[s] the infliction of a public harm." *Id.* (cleaned up).

When the government satisfies the first prong of the Fruits of Labor test, it must then show that "the means chosen to effect that purpose [are] reasonable." *Id.* at 426 (cleaned up). This is a question of fact, and we balance at this second prong "the public good likely to result . . . against the burdens resulting to the businesses being regulated." *Id.* (cleaned up). Courts also considers "how effective is the state action at achieving the desired public purpose, and how burdensome is that state action to the targeted business." *Id.* Again, these are fact-intensive inquiries, and the analysis here "becomes a question of degree—given all the options available to the state to advance the governmental purpose, was it reasonable for the state to choose this approach, with its corresponding benefits and burdens?" *Id.* (cleaned up).

Applying this test, we turn to the Court of Appeals' decision. The Court of Appeals below vacated the trial court's entry of summary judgment and remanded for reconsideration in light of their constitutional analysis. *Bar and Tavern*, 293 N.C.

App. at 423. That analysis concluded that the Governor "failed to present any 'data and science' tending to show *a rational basis* for allowing some types of bars to resume operations while keeping other bars closed." *Id.* (emphasis added). Thus, the Court of Appeals held that "continued closure of [p]laintiffs' bars while permitting other similar establishments to reopen under certain conditions violated [p]laintiffs' right to enjoy the fruits of their own labor from the operation of their respective businesses." *Id.*

This analysis used the wrong legal standard because, as explained above, the legal standard for a claim under the Fruits of Labor Clause is not rational basis. *Ace Speedway,* 386 N.C. at 425. To be fair, though, the Court of Appeals did not have the benefit of our decision in *Ace Speedway* when it decided this case. Neither did the trial court, nor the parties during fact discovery.

"When this Court implements a new analysis to be used in future cases," our approach has been to remand pending cases raising that same legal issue so that the lower courts and the parties may "apply that analysis." *N.C. Farm Bureau Mut. Ins. Co. v. Cully's Motorcross Park, Inc.*, 366 N.C. 505, 514 (2013). Remand is particularly appropriate in a case like this one, where the parties "did not have the benefit of the precise formulation of the doctrine" when engaging in fact discovery. *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 39 (2004). Without knowing the proper constitutional test that must be satisfied, the parties cannot be expected to use the tools of discovery to obtain the information needed to prove their claims.

Accordingly, plaintiffs sufficiently alleged a Fruits of Labor Clause violation that satisfies *Deminski,* and we agree with the Court of Appeals that the trial court's summary judgment order must be vacated and the case remanded for further proceedings. However, some of the reasoning in the Court of Appeals' opinion cannot be squared with our decision in *Ace Speedway.* Therefore, the parties, on remand, are entitled to reopen fact discovery in light of our decision today. The decision of the Court of Appeals on this issue is modified and affirmed, and remanded for further proceedings.

But before leaving our Fruits of Labor discussion, we think it important to address two items in the dissent. First, the dissent claims that this opinion "significantly expands (and misstates)" the legal protections of the Fruits of Labor Clause "by saying that all that is necessary is 'mere interference'—rather than arbitrary interference—with the right to conduct a lawful business or to earn a livelihood." The dissent insists that this "interference" standard is wrong and "majority seems to be hellbent on dramatically reshaping—in record time—the law" in this area.

But bizarre and angry rhetoric has become a staple of our dissenting colleagues' opinions, used to mask the weakness in their underlying reasoning. So it is here. As frustrating as this is for the dissent, for nearly a century, this Court has recognized a Fruits of Labor Clause claim when the state unconstitutionally interferes with the right to conduct a lawful business. *See, e.g., State v. Harris,* 216

N.C. 746, 753 (1940); *State v. Ballance,* 229 N.C. 764, 768 (1949); *Roller v. Allen*, 245 N.C. 516, 521–23 (1957).

In *Harris*, the state imposed burdensome regulations on dry cleaners. 216 N.C. at 760. We struck them down. In *State v. Ballance*, the state imposed licensing rules for professional photographers. 229 N.C. at 768. We again struck them down. *Id.* In *Roller*, the state required an exam for ceramic tile installers. 245 N.C. at 521–23. Once again, we struck it down. *Id.*

None of these cases involved laws prohibiting business activity entirely. They all involved "mere interference" with the right to conduct a lawful business. When state interference fails to satisfy the constitutional test for the Fruits of Labor Clause, the interference is unconstitutional. Here, as explained above, Plaintiffs sufficiently alleged unconstitutional interference, and thus have a right to seek discovery to prove those allegations are true.

The dissent also complains that we are permitting the court system to "Monday morning quarterback" the decisions of the Governor and his cabinet members. Not so. Under the test in *Ace Speedway*, the Governor's actions will be judged on the information available at the time, not on what we know in hindsight. *Ace Speedway*, 386 N.C. at 424–25 and 427. We emphasized this in our discussion above. Once again, the dissent's rhetoric about Monday morning quarterbacking is simply sophistry. What frustrates the dissent is not that Governor Cooper and his public health officials are being held to account through the lens of hindsight; it is that they

are being held to account at all.

## 2. *Equal Protection*

Article I, Section 19 of our State Constitution states that "[n]o person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin." N.C. Const. art. I, § 19. When assessing an Equal Protection Clause claim that the State treated one class of people different from another, courts "employ a two-tiered analysis." *Town of Beech Mountain v. Cnty. of Watauga*, 324 N.C. 409, 412 (1989). "When a legislative act operates to the disadvantage of a suspect class or interferes with the exercise of a fundamental right, the upper tier or 'strict scrutiny' standard is applied." *Id*. "When the claim involves neither a suspect class nor a fundamental right, the lower tier or 'rationality' standard is employed." *Id*. Under this lower, rational basis standard, "the government need only show that the challenged classification bears some rational relationship to a legitimate governmental interest." *Id*.

"Generally speaking, this rationality test is the appropriate standard to apply to purely economic regulations." *Id*. This includes equal protection claims concerning the right to earn a living or engage in a lawful occupation. *Duggins v. North Carolina State Bd. of Certified Pub. Acct. Examiners*, 294 N.C. 120, 131 (1978). In this "area of economics," the State does not violate the Equal Protection Clause because its chosen classification "is not made with mathematical nicety or because in practice it

results in some inequality." *Powe v. Odell*, 312 N.C. 410, 412–13 (1984).

Here, the trial court applied a rational basis test and determined that exempting plaintiffs from reopening could be justified by scientific studies and professional commentary suggesting that there was a need for greater regulation of private bars than other businesses which served alcohol and facilitated public gathering. The Court of Appeals applied strict scrutiny to the Equal Protection claim, arguing that because the fundamental right to earn a living was implicated, precedent required heightened scrutiny. But this cuts to the problem with the Court of Appeals intermingling of its analysis of the Fruits of Labor and Equal Protection claims.

The constitution indeed protects individual rights, but it also enables the state to exercise police powers regulating health, safety, welfare, and morals. As this Court's precedent cited above illustrates, state action in this sphere often impacts the right to earn a living, and economic line drawing is what governments do. While we may disagree with the approach taken by state actors, on an equal protection claim we are concerned not with the best way, but a permissible one. We need look no further than the multitude of rules and regulations surrounding health and safety standards, consumer protection, or sanitation requirements to understand the point: each may implicate an individual's fundamental right to earn a living, but we do not apply strict scrutiny.

Such is the case here. Plaintiffs' directly advanced a Fruits of Labor claim

concerning closure of their businesses and the Governor's justification as it related to other similar businesses. This is separate and distinct from their claim that the line drawing in exercise of the state's police powers was impermissible, and the failure to distinguish the claims subsumes the Equal Protection analysis.

Because there is at least some conceivable basis for the government's action here, we reverse the Court of Appeals.[6] *See White v. Pate*, 308 N.C. 759, 766–767 (1983) ("The rational basis standard merely requires that the governmental classification bear some rational relationship to a conceivable legitimate interest of government." (cleaned up)).

## B. Statutory Claims

### 1. Emergency Management Act

Turning to the plaintiffs' statutory claims, the Emergency Management Act, among other things, grants the Governor the ability to impose significant restrictions or prohibitions on otherwise permissible activity during states of emergency, should the Governor determine that local control of the emergency is insufficient to ensure adequate protection of lives and property. *See* N.C.G.S. § 166A-19.30(c) (2023); N.C.G.S. § 166A-19.20(a) (2023).

---

[6] Of course, this isn't to say heightened scrutiny is unavailable to individuals or groups claiming economic harm from state sponsored emoluments, privileges, or monopolies in violation of the constitution, none of which are at issue here. *See* N.C. Const. art. I, §§ 32, 34; *see also* Richard Dietz, Factories of Generic Constitutionalism, 14 Elon L. Rev. 1 (2022).

Relevant to the restrictions set forth in the Executive Orders here, the Emergency Management Act allows the Governor to restrict "the operation of offices, business establishments, and other places to or from which people may travel or at which they may congregate" or "to maintain order and protect lives or property during the state of emergency."[7]  N.C.G.S. §§ 166A-19.31(b)(2), 19.31(b)(5) (2023).

Compensation is available under the Emergency Management Act only when property is "commandeered, seized, taken, condemned, or otherwise used in coping with an emergency and this action was ordered by the Governor."  N.C.G.S. § 166A-19.73(b) (2023).  "Compensation for services or for the taking or use of property shall be only to the extent that legal obligations of individual citizens are exceeded in a particular case and then only to the extent that the claimant has not been deemed to have volunteered his services or property without compensation."  N.C.G.S. § 166A-19.73(a) (2023).

As we have stated, "[t]he primary rule of construction of a statute is to ascertain the intent of the legislature and to carry out such intention to the fullest extent."  *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 209 (1990).  When construing a statute, "words must be given their common and ordinary meaning, nothing else appearing."  *In re Clayton-Marcus Co., Inc.*, 286 N.C. 215, 219 (1974).  As nothing else appears in the statute, the common and ordinary meanings of the

---

[7] These powers are given specifically to municipalities under N.C.G.S. § 166A-19.31(b) (2023), not directly to the governor.  The governor is able to exercise these powers as listed in subsection 166A-19.31(b) because of N.C.G.S. § 166A-19.30(c).

terms commandeered, seized, taken, condemned, and otherwise used must be applied when interpreting the Emergency Management Act. *Id.*

Thus, the State must provide compensation when the Governor uses power under the Emergency Management Act to commandeer, condemn, seize, take, or otherwise use property. N.C.G.S. § 166A-19.73(b). In other words, under the plain language of the Emergency Management Act, there must be some affirmative appropriation or possession of private property during the stated emergency to qualify for compensation. N.C.G.S. § 166A-19.73(b).

Contrary to plaintiffs' arguments, subsections 166A-19.31(b)(2) and (b)(5) are materially different from subsection 166A-19.73(b) in that neither concern deprivation of property, but rather restrictions on use. *Compare* N.C.G.S. § 166A-19.31(b)(2) and (5) (authorizing prohibition and restriction of the operation of business establishments and other activities reasonably necessary to maintain order and protect lives during a state of emergency) to N.C.G.S. § 166A-19.73(b) (providing compensation only when property is taken, commandeered, seized, or otherwise used in coping with an emergency and the action was ordered by the Governor).

In crafting the Emergency Management Act, the General Assembly clearly contemplated situations under which affected persons could receive compensation. But the General Assembly did not authorize compensation when a governor exercises his or her power under subsections 166A-19.31(b)(2) and (b)(5). We therefore affirm the Court of Appeals.

### 2. *Public Records Act*

Plaintiffs argue that the Court of Appeals erred in holding that the trial court erroneously concluded it had jurisdiction to hear the Public Records Act claim. We disagree.

The Public Records Act states that a person who has been denied access to, or copies of, public records "may apply to the appropriate division of the General Court of Justice for an order compelling disclosure or copying, and the court shall have jurisdiction to issue such orders if the person has complied with" the mediation requirements set forth in section 7A-38.3E. N.C.G.S. § 132-9(a) (2023). Based upon the plain language of the Public Records Act, failure to comply with mediation requirements deprives a court of jurisdiction.

After initiating a suit under the Public Records Act, the parties may select an agreed upon mediator. N.C.G.S. § 7A-38.3E(c) (2023). If the parties are unable to agree, "the party filing the request for mediation shall bring the matter to the attention of the clerk, and a mediator shall be appointed by the senior resident superior court judge." *Id.* The clerk thereafter must notify the parties and the mediator of the appointment. *Id.* Following mediation, or waiver thereof, the mediator must certify to the court that a mediation was conducted, or waived, and the result of such mediation. N.C.G.S. § 7A-38.3E(f) (2023).

Plaintiffs, in their Second Amended Complaint, made a request for the "initiation of mediation of this dispute pursuant to N.C. Gen. Stat. § 7A-38.3E . . . or,

alternatively, for the mediation requirement to be dispensed with pursuant to N.C. Gen. Stat. § 7A38.3E(d)."[8] But merely requesting mediation or a waiver is not sufficient under the statute. The record here does not contain any evidence that the parties agreed on a mediator, that one was appointed, that mediation was attempted, that waiver was appropriate, or that the court was notified of the results of any mediation.

As explained above, mediation is a requirement for the trial court to have jurisdiction to hear the Public Records Act claim. Because mediation was never completed, not only did the trial court not have jurisdiction to decide the merits of the Public Records Act claim, but plaintiffs also could not have substantially prevailed in their Public Records Act claim such that attorneys' fees were appropriate. We therefore affirm the decision of the Court of Appeals on this issue.

## III. Conclusion

On the Fruits of Labor claim, we modify and affirm in part the decision of the Court of Appeals and remand this matter to the trial court to reopen factual discovery and provide a new discovery schedule for the parties. We reverse the Court of Appeals on its Equal Protection determination and affirm on plaintiffs' statutory claims.

MODIFIED AND AFFIRMED IN PART, REVERSED IN PART.

---

[8] It also appears that plaintiffs may have failed to satisfy the service requirements in N.C.G.S. § 7A-38.3E(c).

Justice RIGGS concurring in part and dissenting in part.

The *Corum* claim of the North Carolina Bar and Tavern Association (the Association) under the Fruits of Their Own Labor Clause should be barred on the basis of sovereign immunity because the members of the Association have an adequate alternate remedy under the law, a claim for compensation under the North Carolina Emergency Management Act. Thus, I would conclude that the trial court properly entered judgment in favor of the Governor on his motion to dismiss the Fruits of Their Own Labor claim.

Even if the claim was not barred on the basis of sovereign immunity—and it should be—the Association did not, in its motion for summary judgment, establish a disputed issue of material fact in its Fruits of Their Own Labor claim. Even under the heightened scrutiny of governmental actions challenged under our State Constitution's Fruits of Their Own Labor Clause, as laid out in *Kinsley v. Ace Speedway Racing, Ltd.*, the Association has not met its burden of forecasting evidence that (1) there was not a "proper government purpose for the [state action]"; or (2) the "means chosen to effect that purpose" were not "reasonable." 386 N.C. 418, 424 (2024). Although the Association claimed otherwise in its complaint, it put on no competent evidence in seeking summary judgment that the Governor's stated purpose for entering Executive Order 141—slowing the spread of COVID-19 to save lives—was an improper purpose or that the Governor's actual purpose was something

different. The Association further failed to forecast any disputed facts regarding the means chosen to effectuate the purpose, and specifically that the means were not reasonable. For these reasons, I respectfully dissent.

I concur with the majority's conclusion that the Association has not substantially prevailed in seeking disclosure of documents under the Public Records Act, N.C.G.S. § 132-9(c), and are therefore not entitled to attorneys' fees. I further agree with the majority's decision to reverse the Court of Appeals' ruling on the Association's Equal Protection Claim.

## I.    Factual Background

The executive orders at dispute in this case were issued by then-Governor Cooper in response to the "high public health threat posed by COVID-19 globally and in the United States." On 10 March 2020, with the required concurrence of the duly-elected bipartisan Council of State, the Governor declared a state of emergency as he was authorized to do by N.C.G.S. § 166A-19.30. Exec. Order No. 116, 34 N.C. Reg. 1744, 1744 (Mar. 10, 2020). One week later, on 17 March 2020, the Governor issued Executive Order No. 118 limiting the sale of food and beverages in restaurants and bars to carry-out, drive-through, and delivery only. The order directed the closure of all restaurants and bars for on-site consumption of food or beverages.

Two months later, on 5 May 2020, the Governor began the process of slowly reopening businesses in phases. In Executive Order 138 (Phase 1 Order), restaurants, defined as permitted food establishments under N.C.G.S. § 130A-248,

were allowed to be open for *off-site consumption of food only*. Bars, defined as establishments that are not eating establishments under N.C.G.S. §§ 18B-1000(2) and -1000(6) were "directed to not serve alcoholic beverages for onsite consumption." Exec. Order No. 138, 34 N.C. Reg. 2141, 2148 (May 5, 2020). The only businesses required to remain closed under this Phase 1 Order were personal care and grooming businesses and entertainment facilities without a retail or dining component.

Two weeks later, the Governor continued the process of reopening businesses. The Governor issued Executive Order No. 141, "Easing Restrictions on Travel, Business Operations, and Mass Gatherings: Phase 2." (Phase 2 Order) In this Phase 2 Order, the Governor allowed eating establishments to open for on-premises consumption of food and beverages with limited seating.[1] The Phase 2 Order required entertainment and fitness facilities that "do not offer a retail or dining component" to remain closed. This included: bingo parlors, bowling alleys, indoor exercise facilities, gyms, health clubs and fitness centers, movie theaters, skating rinks, gaming establishments, museums, amusement parks, and, significantly for this case, bars and night clubs.

In a contemporaneous press conference to update the public on the state's response to the pandemic, the Governor noted that the state was experiencing a

---

[1] The Phase 2 Order also allowed all personal care and grooming businesses, including tattoo parlors, to open. The majority groups tattoo parlors with restaurants when describing the businesses that were allowed to open under the Phase 2 Order; however, tattoo parlors were categorized as a personal care and grooming business, and all personal care and grooming businesses were allowed to open with restrictions.

record high number of hospitalizations and deaths related to COVID-19. PBS North Carolina: *Coronavirus Briefing: NC Gov. Roy Cooper*, (YouTube, May 28, 2020), https://www.youtube.com/watch?reload=9&app=desktop&v=9WqTv5idkDk. The Governor emphasized that the "health and safety of North Carolinians [i]s our number one priority" and that the decisions to reopen businesses were difficult but were being "made with daily briefings from doctors and health care experts." *Id.* at 15:00–17:00. The Governor explained that he employed a phased or "dimmer-switch" approach to the reopening of places where people congregate. *Id.* at 18:00-19:00. The dimmer-switch approach worked by opening some categories of businesses, waiting to ensure that any spike in COVID-19 cases did not overwhelm the hospitals, and then opening more categories of businesses. Department of Health and Human Services Secretary Mandy K. Cohen, M.D., M.P.H, stressed the need to "take modest steps forward" in reopening businesses to avoid "overwhelm[ing] the health care system" because the state was experiencing a high number of COVID-19 hospitalizations and positive test results. *Id.* at 22:20.

Almost immediately, on 4 June 2020, the Association filed a complaint challenging Executive Order 141 and sought injunctive relief to reopen bars for onsite beverage consumption. The Association alleged violations of the Association's rights under the Fruits of Their Own Labor Clause and Equal Protection Clause of the North Carolina Constitution and requested compensation under the Emergency Management Act.

## II.   Adequate State Remedy under the Emergency Management Act

It is well established under North Carolina common law that the "doctrine of sovereign immunity . . . prevents a claim for relief against the State except where the State has consented or waived its immunity." *State ex rel. Stein v. Kinston Charter Acad.*, 379 N.C. 560, 570 (2021) (quoting *Harwood v. Johnson*, 326 N.C. 231,238 (1990)).  However, the state may waive sovereign immunity by its conduct, including by enacting statutes that require government agencies to compensate parties for injury.  *See, e.g., Nello L. Teer Co. v. N.C. State Highway Comm'n*, 265 N.C. 1, 9 (1965) (recognizing that state agencies may be subject to suit as expressly provided by statute).  Because the state may waive sovereign immunity by statute, *Corum* claims, i.e., direct claims against the state for remedy of a constitutional violation, are only available "in the absence of an adequate state remedy." *Corum v. Univ. of N.C.*, 330 N.C. 761, 782 (1992); *see also Deminski ex rel. C.E.D. v. State Bd. of Educ.*, 377 N.C. 406, 413 (2021).  For example, in the context of eminent domain, the General Assembly has long provided an established remedy for when private property is taken for a public purpose.  *See, e.g., Ferrell v. Dept. of Transp.*, 334 N.C. 650, 654 (1993) (recognizing that the North Carolina General Assembly may implicitly waive sovereign immunity by obligating a [state agency] to pay compensation to an injured party).  Similarly, here the General Assembly has provided a mechanism for an injured party to seek relief and compensation in a court of law under the Emergency Management Act.

The Phase 2 Order, which placed restrictions on the members of the Association's operations during the pandemic, was authorized by the Emergency Management Act. *See* N.C.G.S. § 166A-19.30 (2023) (outlining the powers of the Governor during a state of emergency). The current version of the Emergency Management Act was passed in 2012 to modernize the "authority and responsibility of the Governor [and] State agencies" to, *inter alia,* respond to and recover "from natural and man-made emergencies" and "[r]educe vulnerability[ies] of people and property of this State to damage, injury, and *loss of life and property.*" N.C.G.S. § 166A-19.1 (2023) (emphasis added) (enunciating the legislative purpose of the Emergency Management Act). An additional purpose of the Emergency Management Act is to "[p]rovide for cooperation and coordination of activities relat[ed] to emergency mitigation, . . . response, and recovery" between the state and "other private and quasi-official organizations." *Id.*

The Emergency Management Act grants the Governor and state agencies the authority to impose "prohibitions and restrictions in the emergency area," that "*in the Governor's discretion*" are appropriate to deal with the emergency. N.C.G.S. § 166A-19.30(c)(1) (emphasis added). The statute expressly authorizes "prohibitions and restrictions" of the "operation of offices, business establishments, and other places to or from which people may travel or at which they may congregate." N.C.G.S. § 166A-19.31(b)(2) (2023).

To advance the goal of encouraging cooperation and coordination between the state and private organizations, the Emergency Management Act provides for compensation "for services or for the taking or use of property . . . to the extent that legal obligations of individual citizens are exceeded." N.C.G.S. § 166-19.73(a) (2023). The compensation under the Emergency Management Act is authorized when "property [i]s commandeered, seized, taken, condemned, or otherwise used in coping with an emergency." N.C.G.S. § 166-19.73(b) (2023).

The majority reads the statutory language for conduct requiring compensation far too narrowly and fails to give meaning to every word in the statute. In the majority's view, the Association's members do not "qualify for compensation" under this statute because the language in the statute requires "some affirmative appropriation or possession of private property during the stated emergency." I disagree and find it curious that the majority is willing to rewrite a statute by adding requirements, by judicial fiat, to reach the constitutional question and broadly expand this Court's jurisprudence under the Fruits of Their Own Labor Clause.

A fundamental principle of statutory interpretation is that courts presume that when the "legislature enacts a statute, it intentionally includes and gives meaning to every word therein." *Happel v. Guilford Cnty. Bd. of Educ.*, 387 N.C. 186, 207 (2025). "Since a legislative body is presumed not to have used superfluous words, our courts must accord meaning, if possible, to every word in a statute." *C Investments 2, LLC*

*v. Auger*, 383 N.C. 1, 12 (2022) (quoting *N.C. Bd. of Exam'rs for Speech & Language Pathologists & Audiologists v. N.C. State Bd. of Educ.*, 122 N.C. App. 15, 21 (1996)).

Thus, to properly interpret the statute, each term the General Assembly included in the statute must have meaning: "commandeered, seized, taken, condemned, or otherwise used property" to "cop[e] with an emergency." N.C.G.S. § 166-19.73(b). Because the terms are not defined in the Emergency Management Act, we interpret the statute based upon the ordinary meaning of the words in the statute. *See Spruill v. Lake Phelps Volunteer Fire Dep't, Inc.*, 351 N.C. 318, 322 (2000) (recognizing that undefined words in a statute should be accorded their "plain and definite meaning when the statutory language at issue is clean and unambiguous" (cleaned up)).

While I agree that the verbs commandeered and seized do, by their plain meaning, suggest an affirmative appropriation or possession, the verbs or phrases "taken" and "otherwise used" do not imply anything other than what they say, and imposing an additional affirmative state action is not justified. *See* N.C.G.S. § 166-19.73(b). "Taken" and "otherwise used" expand the scope of conduct that is the basis for compensation to include restrictions and limitations that stop short of affirmative possession, like the restrictions and limitations in the Phase 2 Order. "Taken" is widely understood to result from "[a]n action by a government, especially under the power of eminent domain, that deprives a private owner of real property or *of the use and enjoyment of that property*." *Taking*, American Heritage Dictionary

(5th ed. 2018) (emphasis added). Similarly, "used" means to "put into service or employ for a purpose." *Use*, American Heritage Dictionary (5th ed. 2018).

Here, the Phase 2 Order used the closure of bars to limit the spread of COVID-19, avoid overwhelming North Carolina's medical infrastructure, and minimize the number of COVID-related deaths in North Carolina. At the time the Governor entered the Phase 2 Order, the spread of COVID-19 had overwhelmed the medical infrastructures and killed thousands of people, both in foreign countries like Italy and large cities in the United States, such as New York City.

It seems strange to conclude that placing limitations and restrictions on businesses that result in restricting the operation of some businesses to protect public safety is not a statutory "tak[ing]" or "other use" under the Emergency Management Act, and at the same time, claim that those same restrictions and limitations infringe on an entity's constitutional rights to under the Fruits of Their Own Labor Clause. To be clear, no one is arguing that people and businesses that make sacrifices for the public good, due to a hurricane or a pandemic or any other such emergency, should lose their businesses because of that. Indeed, foreseeing the need for such equitable state action, when the General Assembly, by statute, required businesses to cooperate, coordinate, and contribute to the emergency response even in ways that significantly impacts businesses for the purpose of protecting the public welfare, the legislature put in place a means of incentivizing or compensating the businesses for that contribution to the greater good. The General Assembly has done this by

authorizing compensation under the Emergency Management Act. N.C.G.S. § 166A-19.73 (2023) (authorizing the state to make compensation for property commandeered, seized, taken, condemned, or otherwise used in coping with an emergency [when] this action was ordered by the Governor). The legislature also plainly afforded the discretion to effectuate this statute through prohibitions or restrictions issued by Governor. N.C.G.S. § 166A-19.30(c)(1). Separately, the state and federal government also appropriated funds to compensate businesses for the impact of business closures. *See, e.g.*, CARES Act, Pub. L. No. 116-136, § 1102, 134 Stat. 281, 286–94; U.S. Small Bus. Admin., Paycheck Protection Program (PPP) Report 2, 5 (May 31, 2021), https://www.sba.gov/sites/default/files/2021-06/PPP_Report_Public_210531-508.pdf; 2020 COVID-19 Recovery Act, S.L. 2020-4, § 4.2(a)–(d), 2020 N.C. Sess. Laws 68, 85–87. Where the legislature has created ample and adequate state remedies for businesses that were injured by the collective action needed to rein in a pandemic, there is no need for this Court to reach a constitutional claim barred by sovereign immunity.

The General Assembly established a route for the Association's members to receive compensation for the closures applied to establishments that are not eating establishments. *See Deminski*, 377 N.C. at 413-14 (recognizing that "a plaintiff must have at least the opportunity to enter the courthouse doors and present his claim"). The Governor acted within the discretion afforded him under the Emergency Management Act and that Act also provides the Association with a means to request

compensation for the effect of the action on their businesses. The proper action, then, is to remand for reconsideration of claims under this Emergency Management Act. Any common law claim under *Corum* should fail because there is an adequate state remedy. Even if the compensation available through the Emergency Management Act does not necessarily make the plaintiffs whole, the Act nonetheless provides an adequate remedy. *Washington v. Cline*, 385 N.C. 824, 829 (2024) (confirming that an "adequate remedy is a meaningful one, though not necessarily the one the plaintiff might prefer"). For these reasons, I would dismiss the *Corum* claim and remand for consideration of the Association's claim for compensation under the Emergency Management Act.

### III.    Fruits of Their Own Labor claim

Even if there were no other adequate state remedy, I would conclude that the trial court did not err by entering summary judgment in favor of the Governor because the Association did not forecast evidence to establish a disputed issue of material fact for its Fruits of Their Own Labor claim even under the generous standard set forth in *Kinsley v. Ace Speedway*, 386 N.C. 418, 425 (2024). To establish a claim under the Fruits of Their Own Labor Clause, a plaintiff must show that the challenged state action was not for a "proper governmental purpose," of "promot[ing] the accomplishment of a public good[ ], or . . . prevent[ing] the infliction of a public harm. *Id.* at 425 (first quoting *Poor Richard's Inc. v. Stone*, 322 N.C. 61, 64 (1988); and then quoting *State v. Ballance*, 229 N.C. 764, 770 (1949)). Under the two-prong

test outlined there, "[i]f the reviewing court determines that the challenged state action serves a proper government purpose," then the *plaintiff* must show that the means chosen to effectuate that purpose were not reasonable. *Id.* at 426.[2] "The means used must be measured by balancing the public good likely to result from their utilization against the burdens resulting to the businesses being regulated." *Poor Richard's*, 322 N.C. at 66 (citing *In re Certificate of Need for Aston Park Hospital, Inc.*, 282 N.C. 542, 550 (1973)).

In *Ace Speedway*, this Court established that the test for assessing a challenge to a governmental action under a Fruits of Their Own Labor claim is more stringent than the rational basis test; we called it a reasonable basis test. To be sure, I do not understand such claims to be evaluated under a strict scrutiny standard, but this reasonable basis standard is more stringent than a rational basis standard. For a Fruits of Their Own Labor claim, a reviewing court looks to "identify the State's actual purpose for the constraint on private business activity." *Ace Speedway,* 386 N.C. at 424. As we explained in *Ace Speedway*, a plaintiff may rebut the State's asserted purpose "with evidence demonstrating that the State's asserted purpose is not a true one, and instead the State is pursuing a different unstated purpose." *Id.*

---

[2] The majority improperly shifts the burden of proof to the State on this second step, when it stated "[w]hen the government satisfies the first prong of the Fruits of [Their Own] Labor test, it must then show that 'the means chosen to effect that purpose [are] reasonable.'" When challenging state action as unconstitutional, the burden of proof is on the plaintiff to show that the state action was unconstitutional. *See McKinney v. Goins*, 387 N.C. 35, 44 (2025) (recognizing that the party challenging the constitutionality of state action bears the burden of showing the state action is unconstitutional).

at 425. For example, in *Ace Speedway*, the State asserted that an abatement order to close the speedway was for a proper government purpose of "protecting North Carolinians from a novel virus—a virus that would eventually kill over one million Americans." *Id.* at 426. However, in its complaint, the plaintiff challenged that contention by alleging that "it was singled out by the Governor for enforcement" because of its political speech and "other businesses violating the emergency order were not subject to similar enforcement action by the State." *Id.* (cleaned up).

Importantly, of course, at the procedural posture in *Ace Speedway*, a motion to dismiss, the court considers whether the parties had "sufficiently allege[d]" a claim under the Fruits of Their Own Labor Clause. *Id.* at 422–23; *see also Deminski*, 377 N.C. at 412. When considering a complaint dismissed under Rule 12(b)(6), "we treat plaintiff's factual allegations as true." *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC.*, 362 N.C. 431, 442 (2008) (quoting *Stein v. Asheville City Bd. of Educ.*, 360 N.C. 321, 325 (2006). Because the plaintiff in *Ace Speedway* had alleged an improper purpose, at that procedural posture, we accepted as true and thus that the plaintiff met the standard of showing an improper purpose. *Ace Speedway*, 386 N.C. at 426–27.

In contrast, here, the Association sought summary judgment.[3] Summary judgment is properly granted when the forecast of evidence "reveals no genuine issue

---

[3] The trial court here denied the Association's motion for partial summary judgment and granted the Governor's motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Appellate Procedure. However, because the trial court considered issues outside of the

as to any material fact, and when the moving party is entitled to a judgment as a matter of law." *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (quoting *Koontz v. City of Winston-Salem*, 280 N.C. 513, 518 (1972)). "A genuine issue is one that can be maintained by substantial evidence." *Id.* (cleaned up) "All facts asserted by the adverse party are taken as true, and their inferences must be viewed in the light most favorable to that party." *Id.* (citation omitted).

We review de novo the trial court's decision to enter summary judgment in favor of the Governor. *Forbis v. Neal*, 361 N.C. 519, 524 (2007). At summary judgment, we assess the merits of a claim under the Fruits of Their Own Labor Clause to determine whether the Association established a disputed issue of material fact such that summary judgment in favor of the State was improper. "Summary judgment in favor of the non-movant is appropriate when the evidence presented demonstrates that no material issues of fact are in dispute, and the non-movant is entitled to entry of judgment as a matter of law." *A-S-P Assocs. v. City of Raleigh*, 298 N.C. 207, 212 (1979). The Association had the burden of showing "a genuine issue" of material fact, and because the record does not show a factual dispute the Governor is entitled to summary judgment.

---

complaint, the Court of Appeals properly considered the trial court's order granting the Governor's motion to dismiss as an order granting summary judgment in favor of the Governor. *See Stanback v. Stanback*, 297 N.C. 181, 205 (1979) (explaining a Rule 12(b)(6) motion to dismiss is "converted to a Rule 56 motion for summary judgment when matters outside the pleadings are presented to and not excluded by the court").

First, the Association did not forecast evidence rebutting the Governor's stated purpose in entering the order. The Phase 2 Order states that "slowing and controlling community spread of COVID-19 is critical to ensuring that the [S]tate's healthcare facilities remain able to accommodate those who require medical assistance" and "the continued community spread" with more than twenty thousand confirmed cases and hundreds of deaths "requires the [S]tate to continue measures to slow the spread of this virus." Exec. Order No. 141, 34 N.C. Reg. 2360, 2360–61 (May 20, 2020). The Association, via affidavit or other mechanism, offered no evidence that the Governor's purported reason was pretextual. The only pieces of evidence submitted by the Association in support of the motion for summary judgment were affidavits from bar owners explaining the hardships caused by the Phase 2 Order, including inability to pay rent and personal debts. Because the Association did not forecast evidence that the Governor's stated purpose for the Phase 2 Order was not the actual purpose for the order—even under the reasonable basis standard—the Fruits of Their Own Labor claim should fail at this point. However, because the majority remands this case to reopen discovery and gives the Association a second chance to establish its claim, I find it necessary to address the second prong of the test for a Fruits of Their Own Labor claim.

At summary judgment, the Association must forecast evidence that the means chosen to effectuate that purpose were not reasonable. *See Ace Speedway*, 386 N.C. at 426 ("If the reviewing court determines that the challenged state action serves a

proper governmental purpose, the inquiry then reaches the second stage: 'are the means chosen to effect that purpose reasonable?' ")(quoting *Poor Richard's*, 322 N.C. at 64). The reviewing court balances the public good likely to result from the government action "against the burden resulting to the business being regulated." *Id.* The Association provided affidavits that document the burden to their businesses. However, the Association does not even attempt to show that the means employed by the Phase 2 Order to effectuate its proper purposes were unreasonable to "slow the spread of COVID," "avoid overwhelming the health care system," and protect the lives of North Carolinians.

In contrast, the Governor forecasted evidence that the means employed for a phased reopening of business— in a manner that controlled the spread of COVID-19 and protected the lives of North Carolinians—were reasonable. The Governor provided the affidavit of Elizabeth Cuervo Tilson, M.D., M.P.H., the Chief Medical Officer for the North Carolina Department of Health and Human Services. Dr. Tilson attested that the individuals developing the policy recommendations were reviewing and considering "the most recent data and studies from scientific publications and the Centers for Disease Control and Prevention (CDC), as well as experiences from other countries and states." Specifically, the medical and public health team constantly evaluated "scientific literature, current studies, media reports, and any related data that speaks to the risks of transmission of the virus and the effectiveness of mitigation measures that counties, states, and localities have put in place to

minimize transmission of the virus." In her affidavit, Dr. Tilson explains what was known about how COVID-19 is transmitted and why the nature of bars makes them more conducive to the transmission of COVID-19. The Association did not forecast evidence that the analytical approach to the phased reopening employed by the Governor was not reasonable.

The majority significantly expands (and misstates) the standard for a state action to violate the Fruits of Their Own Labor Clause by saying that all that is necessary is "mere interference"—rather than arbitrary interference—with the right to conduct a lawful business or to earn a livelihood. The cases that the majority rely upon confirm that the proper standard is arbitrary interference. This Court has long recognized "that the police power of the State may be exercised to enact laws, within constitutional limits, to protect or promote the health, morals, order, safety, and general welfare of society." *King v. Town of Chapel Hill*, 367 N.C. 400, 406 (2014) (cleaned up) (quoting *Standley v. Town of Woodfin*, 362 N.C. 328, 333 (2008)). An "exertion of the police power inevitably results in a limitation of personal liberty, and legislation in this field is justified on the theory that the social interest is paramount." *Id.* at 406 (cleaned up) (quoting *Ballance*, 229 N.C. at 769). The Fruits of Their Own Labor Clause " prevent[s] *arbitrary* government actions that interfere with the right to the fruits of one's own labor. *Id.* at 408. (emphasis added).

The cases the majority cite do not overturn statutes for "mere interference"; rather the Court looked for *arbitrary* interference without a proper relation to the

health, morals, order, safety, and general welfare of society. First in *State v. Harris*, this Court concluded a statute violated the Fruits of Their Own Labor Clause because it "delegated legislative function to create standards" for dry cleaners to a private group, the commission, and "fail[ed] to fix limits within which the discretion of the commission may be exercised." 216 N.C. 746, 753 (1940). That failure to fix limits meant that the Commission could use the police power for a private purpose—"narrowing the field of competition" by arbitrarily discriminating among dry cleaners within the state. *Id.* at 754–54. It was the arbitrary nature of the exercise of police power by the commission that led this Court to invalidate the statute. *Id.*

Similarly, in *Ballance*, this Court recognized that the statute at issue, regulating photography, exceeded the police power of the state because it was not reasonably necessary to "promot[e] or protect[ ]. . . the public health, morals order or safety, or the general welfare." *Ballance*, 229 N.C. at 770. Legitimate state action, the Court recognized, must have a rational, real, or substantial relation to public health, moral order, safety, or general welfare. *Id.* Then in *Roller*, this Court invalidated a test for ceramic tile installers because the licensing board which promulgated the test had the power to create a monopoly out of the ceramic tile industry. *Id.* at 523. The Court acknowledged that a "state cannot under the guise of protecting the public, arbitrarily interfere with private business . . . ." *Id.* at 525.

Here, the Association did not forecast evidence that the Phase 2 Order arbitrarily interfered with businesses without a rational, real, or substantial relation

to public safety—saving the lives of North Carolinians in the face of an unprecedented worldwide pandemic.

Implicitly acknowledging that the Association did not meet the burden established by 85 years of caselaw and most recently explained in *Ace Speedway*, the majority reopens discovery and lets the Association try again. This approach affords special treatment to the Association that other litigants have not been granted by this Court when it changes the standard for assessing constitutional violations. *See, e.g.*, *Community Success Initiative v. Moore*, 384 N.C. 194, 232–33, 240 (2023) (changing the standard for review of a statute that limits the right to vote from strict scrutiny to rational basis after plaintiffs won partial summary judgment and then remanding the case to the trial court for dismissal with prejudice, without a second chance to reopen discovery); *Holmes v. Moore*, 384 N.C. 426, 441, (2023) (changing the standard for a facial challenge to a state statute under the Equal Protection Clause and then remanding to the trial court not to reopen discovery but rather to dismiss the plaintiff's claims with prejudice).

Even though the Association did not forecast evidence that the Phase 2 Order arbitrarily interfered with the businesses without a rational, real, and substantial relation to health and safety, the majority reads significantly more protection into our State Constitution for businesses than for the people of our state. Unfortunately, the majority seems to be hellbent on dramatically reshaping—in record time—the law as it relates to any economic regulation, even in the public health realm.

Additionally, the majority seems to suggest that partisanship is at play in this dissent when it states: "What frustrates the dissent is not that Governor Cooper and his public health officials are being held to account through the lens of hindsight; it is that they are being held to account at all." Not so. Perhaps when one views the world and law through a partisan lens, that lens distorts one's appreciation of recent history and facts. The signatories to this dissent just last year joined a unanimous opinion ruling against the Governor and his public health officials and articulating a test for liability under the Fruits of Their Own Labor clause. *Ace Speedway*, 386 N.C. at 429. And this very dissent rejects arguments made by the Governor with respect to the potential availability of remedies under the Emergency Management Act.

At the end of the day, this Court is charged with the important duty to assess, under the standard from *Ace Speedway,* the relative benefit of economic regulations to the social interest based upon the evidence presented by a party seeking summary judgment for claims under the Fruits of Their Own Labor Clause. We can and should employ a balancing test to ensure that "given all the options available to the [S]tate to advance the government purpose, . . . it was reasonable for the [S]tate to choose this approach, with its corresponding benefits and burdens." *Ace Speedway*, 386 N.C. at 426. But this careful judicial approach is not an opportunity to second-guess state action with the benefit of hindsight. Courts cannot "Monday morning quarterback"

state actions taken in the midst of an unprecedented global pandemic.[4]  As most sports aficionados would likely concede, it is far easier to suggest plays after the game that may have produced a better result than to actually make decisions based only upon the information available on the playing field—particularly when human lives are on the line.  More importantly, court second-guessing appropriate legislative and executive actions violates the separation of powers found in the State Constitution.  *See State ex rel. McCrory v. Berger*, 368 N.C. 633, 635 (2016).

In the context of orders entered during an emergency, the reasonableness of the Phase 2 Order can be assessed through the prism of what the Governor and the team advising him knew at the time.  *Cf. Diamond v. McDonald Service Stores*, 211 N.C. 632, 634 (1937) (recognizing that in the context of a negligence action the standard of care is what a "reasonably prudent man would have used under the circumstances" but "the degree of care which a reasonably prudent man exercises varies with the exigencies of the occasion").  Unlike legislative action, which is less time-sensitive and allows the legislature to commission reports to study the effectiveness of regulations, in an emergency such as the COVID pandemic, the Governor did not

---

[4] It is worth noting at this juncture that in 2020 when the Phase 2 Order was in place, North Carolina had one of the lowest rates of COVID related deaths per 100,000 residents within the fifty states as reported by the National Center for Health Statistics.  Centers for Disease                                                                                    Control https://www.cdc.gov/nchs/pressroom/sosmap/covid19_mortality_final/COVID19.htm    (last visited Aug. 17, 2025).

have the luxury of commissioning a peer-reviewed study to research the exact effect of different possible governmental regulations on the spread of a deadly disease.

To protect lives, the Governor had to act based on the science that was available at the time. As discussed above, the affidavit from Dr. Tillson establishes the scientific evidence that the Governor and public health officials were considering at the time. And with respect to which businesses opened under which phases, the Governor employed business classifications, designated by statute, allowing eating establishments to be open for on-site consumption but restricteding non-eating establishments. *See Poor Richard's*, 322 N.C. at 65 (recognizing that this Court has upheld regulatory business legislation so long as it was based on some distinguishing feature of the business itself). The Phase 2 Order allowed restaurants to open for "on-premises consumption of food and beverages" with limitations on the number of people that could be in the establishment and how close they could sit to one another. Exec. Order 141, 34 N.C. Reg. at 2367. "[E]stablishments that are not eating establishments or restaurants as defined in N.C.[G.S.] §§ 18B-1000(2) and 18B-1000(6)" remained closed. *Id.* at 2364, 2372. The Governor's use of existing regulatory guidelines to draw lines for which businesses remained closed, aligned with approaches this Court has affirmed in the past. *See Poor Richard's*, 322 N.C. at 65.

Science does not always graft on perfectly to how regulatory lines are drawn in an emergency. Thus, because the Association did not forecast any evidence to suggest

that there was, at the time, a more reasonable means of trying to contain the devastation wrought by the COVID pandemic and the Governor introduced competent evidence to support the reasonableness of the executive orders, the Association does not satisfy the second prong of the *Ace Speedway* test and summary judgment was properly entered for the Governor. *See A-S-P Assocs.*, 298 N.C. at 214 ("When the most that can be said against [a state action] is that whether it was an unreasonable, arbitrary or unequal exercise of power is fairly debatable, the courts will not interfere. In such circumstances the settled rule seems to be that the court will not substitute its judgment for that of the legislative body charged with the primary duty and responsibility of determining whether its action is in the interest of the public health, safety, morals or general welfare." (cleaned up)).

In sum, I would dismiss the Association's *Corum* claim because there is an adequate alternate remedy in the Emergency Management Act and sovereign immunity thus bars this action. Assuming *arguendo* there was no adequate state remedy, I would reverse the Court of Appeals because the Association did not meet its burden to forecast disputed issues of material fact on the Fruits of Their Own Labor claim and the Governor provided evidence amply sufficient to establish his actual purpose and the reasonableness of the means he chose to advance that purpose. Thus, summary judgment in favor of the Governor was proper even under the heightened standard set forth in *Ace Speedway*. For these reasons, I respectfully dissent.

Justice EARLS joins in this concurring in part and dissenting in part opinion.